## OFFICE OF PERSONNEL MANAGEMENT *v.* RICHMOND

No. 88–1943.  Argued February 21, 1990—Decided June 11, 1990

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, BLACKMUN, O'CONNOR, and SCALIA, JJ., joined. WHITE, J., filed a concurring opinion, in which BLACKMUN, J., joined, *post*, p. 434. STEVENS, J., filed an opinion concurring in the judgment, *post*, p. 435. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 437.

*Solicitor General Starr* argued the cause for petitioner. With him on the briefs were *Assistant Attorney General Gerson, Deputy Solicitor General Shapiro, William Kanter,* and *Richard Olderman.*

*Gill Deford* argued the cause for respondent. With him on the brief were *Peter Komlos-Hrobsky* and *Neal S. Dudovitz.*

JUSTICE KENNEDY delivered the opinion of the Court.

This case presents the question whether erroneous oral and written advice given by a Government employee to a

benefits claimant may give rise to estoppel against the Government and so entitle the claimant to a monetary payment not otherwise permitted by law. We hold that payments of money from the Federal Treasury are limited to those authorized by statute, and we reverse the contrary holding of the Court of Appeals.

I

Not wishing to exceed a statutory limit on earnings that would disqualify him from a disability annuity, respondent Charles Richmond sought advice from a federal employee and received erroneous information. As a result he earned more than permitted by the eligibility requirements of the relevant statute and lost six months of benefits. Respondent now claims that the erroneous and unauthorized advice should give rise to equitable estoppel against the Government, and that we should order payment of the benefits contrary to the statutory terms. Even on the assumption that much equity subsists in respondent's claim, we cannot agree with him or the Court of Appeals that we have authority to order the payment he seeks.

Respondent was a welder at the Navy Public Works Center in San Diego, California. He left this position in 1981 after petitioner, the Office of Personnel Management (OPM), approved his application for a disability retirement. OPM determined that respondent's impaired eyesight prevented him from performing his job and made him eligible for a disability annuity under 5 U. S. C. § 8337(a). Section 8337(a) provides this benefit for disabled federal employees who have completed five years of service. The statute directs, however, that the entitlement to disability payments will end if the retired employee is "restored to an earning capacity fairly comparable to the current rate of pay of the position occupied at the time of retirement." § 8337(d).

The statutory rules for restoration of earning capacity are central to this case. Prior to 1982, an individual was deemed

restored to earning capacity, and so rendered ineligible for a disability annuity, if

> "in *each of 2 succeeding calendar years* the income of the annuitant from wages or self-employment . . . equals at least 80 percent of the current rate of pay of the position occupied immediately before retirement." 5 U. S. C. § 8337(d) (1976 ed.) (emphasis added).

The provision was amended in 1982 by the Omnibus Budget Reconciliation Act, Pub. L. 97–253, 96 Stat. 792, to change the measuring period for restoration of earning capacity from two years to one:

> "Earning capacity is deemed restored if *in any calendar year* the income of the annuitant from wages or self-employment or both equals at least 80 percent of the current rate of pay of the position occupied immediately before retirement." 5 U. S. C. § 8337(d) (emphasis added).

After taking disability retirement for his vision impairment, respondent undertook part-time employment as a schoolbus driver. From 1982 to 1985, respondent earned an average of $12,494 in this job, leaving him under the 80% limit for entitlement to continued annuity payments. In 1986, however, he had an opportunity to earn extra money by working overtime. Respondent asked an employee relations specialist at the Navy Public Works Center's Civilian Personnel Department for information about how much he could earn without exceeding the 80% eligibility limit. Relying upon the terms of the repealed pre-1982 statute, under which respondent could retain the annuity unless his income exceeded the 80% limit in *two* consecutive years, the specialist gave respondent incorrect advice. The specialist also gave respondent a copy of Attachment 4 to Federal Personnel Manual Letter 831–64, published by OPM, which also stated the former 2-year eligibility rule. The OPM form was correct when written in 1981; but when given to respondent, the

form was out of date and therefore inaccurate. Respondent returned to the Navy in January 1987 and again was advised in error that eligibility would be determined under the old 2-year rule.

After receiving the erroneous information, respondent concluded that he could take on the extra work as a schoolbus driver in 1986 while still receiving full disability benefits for impaired vision so long as he kept his income for the previous and following years below the statutory level. He earned $19,936 during 1986, exceeding the statutory eligibility limit. OPM discontinued respondent's disability annuity on June 30, 1987. The annuity was restored on January 1, 1988, since respondent did not earn more than allowed by the statute in 1987. Respondent thus lost his disability payments for a 6-month period, for a total amount of $3,993.

Respondent appealed the denial of benefits to the Merit Systems Protection Board (MSPB). He argued that the erroneous advice given him by the Navy personnel should estop OPM and bar its finding him ineligible for benefits under the statute. The MSPB rejected this argument, noting that the officials who misinformed respondent were from the Navy, not OPM. The MSPB observed that, "[h]ad [respondent] directed his request for information to the OPM, presumably, he would have learned of the change in the law." The MSPB held that "OPM cannot be estopped from enforcing a statutorily imposed requirement for retirement eligibility." App. to Pet. for Cert. 22a. The MSPB denied respondent's petition for review, and respondent appealed to the Court of Appeals for the Federal Circuit.

A divided panel of the Court of Appeals reversed, accepting respondent's contention that the misinformation from Navy personnel estopped the Government, and that the estoppel required payment of disability benefits despite the statutory provision to the contrary. The Court of Appeals acknowledged the longstanding rule that "ordinarily the government may not be estopped because of erroneous or unau-

thorized statements of government employees when the asserted estoppel would nullify a requirement prescribed by Congress." 862 F. 2d 294, 296 (1988). Nonetheless, the Court of Appeals focused on this Court's statement in an earlier case that "we are hesitant . . . to say that there are *no cases*" where the Government might be estopped. *Heckler* v. *Community Health Services of Crawford County, Inc.*, 467 U. S. 51, 60 (1984). The Court of Appeals then discussed other Court of Appeals and District Court opinions that had applied estoppel against the Government.

The Court of Appeals majority decided that "[b]ased on the Supreme Court's acknowledgment that the estoppel against the government is not foreclosed and based on court of appeals rulings applying estoppel against the government, our view is that estoppel is properly applied against the government in the present case." 862 F. 2d, at 299. The Court reasoned that the provision of the out-of-date OPM form was "affirmative misconduct" that should estop the Government from denying respondent benefits in accordance with the statute. The facts of this case, it held, are "sufficiently unusual and extreme that no concern is warranted about exposing the public treasury to estoppel in broad or numerous categories of cases." *Id.*, at 301. Judge Mayer dissented, stating that the majority opinion made "a chasm out of the crack the Supreme Court left open in *Community Health Services*," and that the award of benefits to respondent "contravenes the express mandate of Congress in 5 U. S. C. § 8337(d) . . . and Supreme Court precedent." *Id.*, at 301, 303.

We granted certiorari, 493 U. S. 806 (1989).

## II

From our earliest cases, we have recognized that equitable estoppel will not lie against the Government as it lies against private litigants. In *Lee* v. *Munroe & Thornton*, 7 Cranch 366 (1813), we held that the Government could not be bound

by the mistaken representations of an agent unless it were clear that the representations were within the scope of the agent's authority. In *The Floyd Acceptances*, 7 Wall. 666 (1869), we held that the Government could not be compelled to honor bills of exchange issued by the Secretary of War where there was no statutory authority for the issuance of the bills. In *Utah Power & Light Co.* v. *United States*, 243 U. S. 389, 408–409 (1917), we dismissed the argument that unauthorized representations by agents of the Government estopped the United States to prevent erection of power houses and transmission lines across a public forest in violation of a statute: "Of this it is enough to say that the United States is neither bound nor estopped by acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done what the law does not sanction or permit."

The principles of these and many other cases were reiterated in *Federal Crop Ins. Corporation* v. *Merrill*, 332 U. S. 380 (1947), the leading case in our modern line of estoppel decisions. In *Merrill*, a farmer applied for insurance under the Federal Crop Insurance Act to cover his wheat farming operations. An agent of the Federal Crop Insurance Corporation advised the farmer that his entire crop qualified for insurance, and the farmer obtained insurance through the Corporation. After the crop was lost, it was discovered that the agent's advice had been in error, and that part of the farmer's crop was reseeded wheat, not eligible for federal insurance under the applicable regulation. While we recognized the serious hardship caused by the agent's misinformation, we nonetheless rejected the argument that his representations estopped the Government to deny insurance benefits. We recognized that "not even the temptations of a hard case" will provide a basis for ordering recovery contrary to the terms of the regulation, for to do so would disregard "the duty of all courts to observe the conditions defined by Congress for charging the public treasury." *Id.*, at 385–386.

Despite the clarity of these earlier decisions, dicta in our more recent cases have suggested the possibility that there might be some situation in which estoppel against the Government could be appropriate. The genesis of this idea appears to be an observation found at the end of our opinion in *Montana* v. *Kennedy*, 366 U. S. 308 (1961). In that case, petitioner brought a declaratory judgment action seeking to establish his American citizenship. After discussing petitioner's two statutory claims at length, we rejected the final argument that a consular official's erroneous advice to petitioner's mother that she could not return to the United States while pregnant prevented petitioner from having been born in the United States and thus deprived him of United States citizenship. Our discussion was limited to the observation that in light of the fact that no legal obstacle prevented petitioner's mother from returning to the United States,

> "what may have been only the consular official's well-meant advice—'I am sorry, Mrs., you cannot [return to the United States] in that condition'—falls far short of misconduct such as might prevent the United States from relying on petitioner's foreign birth. In this situation, we need not stop to inquire whether, as some lower courts have held, there may be circumstances in which the United States is estopped to deny citizenship because of the conduct of its officials." *Id.*, at 314–315.

The proposition about which we did not "stop to inquire" in *Kennedy* has since taken on something of a life of its own. Our own opinions have continued to mention the possibility, in the course of rejecting estoppel arguments, that some type of "affirmative misconduct" might give rise to estoppel against the Government. See *INS* v. *Hibi*, 414 U. S. 5, 8 (1973) *(per curiam)* ("While the issue of whether 'affirmative misconduct' on the part of the Government might estop it from denying citizenship was left open in *Montana* v. *Kennedy*, 366 U. S. 308, 314, 315 (1961), no conduct of the sort

there adverted to was involved here"); *Schweiker* v. *Hansen,* 450 U. S. 785, 788 (1981) *(per curiam)* (denying an estoppel claim for Social Security benefits on the authority of *Merrill, supra,* but observing that the Court "has never decided what type of conduct by a Government employee will estop the Government from insisting upon compliance with valid regulations governing the distribution of welfare benefits"); *INS* v. *Miranda,* 459 U. S. 14, 19 (1982) *(per curiam)* ("This case does not require us to reach the question we reserved in *Hibi,* whether affirmative misconduct in a particular case would estop the Government from enforcing the immigration laws"); *Heckler* v. *Community Health Services,* 467 U. S., at 60 ("We have left the issue open in the past, and do so again today").

The language in our decisions has spawned numerous claims for equitable estoppel in the lower courts. As JUSTICE MARSHALL stated in dissent in *Hansen, supra,* "[t]he question of when the Government may be equitably estopped has divided the distinguished panel of the Court of Appeals in this case, has received inconsistent treatment from other Courts of Appeals, and has been the subject of considerable ferment." 450 U. S., at 791 (citing cases). Since that observation was made, federal courts have continued to accept estoppel claims under a variety of rationales and analyses. In sum, Courts of Appeals have taken our statements as an invitation to search for an appropriate case in which to apply estoppel against the Government, yet we have reversed every finding of estoppel that we have reviewed. Indeed, no less than three of our most recent decisions in this area have been summary reversals of decisions upholding estoppel claims. See *Hibi, supra; Hansen, supra; Miranda, supra.* Summary reversals of courts of appeals are unusual under any circumstances. The extraordinary number of such dispositions in this single area of the law provides a good indication that our approach to these cases has provided inadequate

guidance for the federal courts and served only to invite and prolong needless litigation.

The Solicitor General proposes to remedy the present confusion in this area of the law with a sweeping rule. As it has in the past, the Government asks us to adopt "a flat rule that estoppel may not in any circumstances run against the Government." *Community Health Services, supra,* at 60. The Government bases its broad rule first upon the doctrine of sovereign immunity. Noting that the "'United States, as sovereign, is immune from suit save as it consents to be sued,'" *United States* v. *Mitchell,* 445 U. S. 535, 538 (1980), petitioner asserts that the courts are without jurisdiction to entertain a suit to compel the Government to act contrary to a statute, no matter what the context or circumstances. See Brief for Petitioner 12–13. Petitioner advances as a second basis for this rule the doctrine of separation of powers. Petitioner contends that to recognize estoppel based on the misrepresentations of Executive Branch officials would give those misrepresentations the force of law, and thereby invade the legislative province reserved to Congress. This rationale, too, supports the petitioner's contention that estoppel may never justify an order requiring executive action contrary to a relevant statute, no matter what statute or what facts are involved.

We have recognized before that the "arguments the Government advances for the rule are substantial." *Community Health Services, supra,* at 60. And we agree that this case should be decided under a clearer form of analysis than "we will know an estoppel when we see one." *Hansen, supra,* at 792 (MARSHALL, J., dissenting). But it remains true that we need not embrace a rule that no estoppel will lie against the Government in any case in order to decide this case. We leave for another day whether an estoppel claim could ever succeed against the Government. A narrower ground of decision is sufficient to address the type of suit presented here,

a claim for payment of money from the Public Treasury contrary to a statutory appropriation.

## III

The Appropriations Clause of the Constitution, Art. I, § 9, cl. 7, provides that: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." For the particular type of claim at issue here, a claim for money from the Federal Treasury, the Clause provides an explicit rule of decision. Money may be paid out only through an appropriation made by law; in other words, the payment of money from the Treasury must be authorized by a statute. All parties here agree that the award respondent seeks would be in direct contravention of the federal statute upon which his ultimate claim to the funds must rest, 5 U. S. C. § 8337. The point is made clearer when the appropriation supporting the benefits sought by respondent is examined. In the same subchapter of the United States Code as the eligibility requirements, Congress established the Civil Service Retirement and Disability Fund. § 8348(a)(1)(A). That section states in pertinent part: "The Fund . . . is appropriated for the payment of . . . benefits *as provided by* this subchapter . . . ." (Emphasis added.) The benefits respondent claims were not "provided by" the relevant provision of the subchapter; rather, they were specifically denied. It follows that Congress has appropriated no money for the payment of the benefits respondent seeks, and the Constitution prohibits that any money "be drawn from the Treasury" to pay them.

Our cases underscore the straightforward and explicit command of the Appropriations Clause. "It means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Cincinnati Soap Co.* v. *United States,* 301 U. S. 308, 321 (1937) (citing *Reeside* v. *Walker,* 11 How. 272, 291 (1851)). In *Reeside, supra,* we addressed a claim brought by the holder of a judgment of indebtedness against the United States that the Secretary of

the Treasury of the United States should be ordered to enter the claim upon the books of the Treasury so that the debt might be paid. In rejecting petitioner's claim for relief, we stated as an alternative ground for decision that if

> "the petition in this case was allowed so far as to order the verdict against the United States to be entered on the books of the Treasury Department, the plaintiff would be as far from having a claim on the Secretary or Treasurer to pay it as now. The difficulty in the way is the want of any appropriation by Congress to pay this claim. It is a well-known constitutional provision, that no money can be taken or drawn from the Treasury except under an appropriation by Congress. See Constitution, art. 1, § 9 (1 Stat. at Large, 15).
>
> "However much money may be in the Treasury at any one time, not a dollar of it can be used in the payment of any thing not thus previously sanctioned. Any other course would give to the fiscal officers a most dangerous discretion." *Id.*, at 291.

The command of the Clause is not limited to the relief available in a judicial proceeding seeking payment of public funds. Any exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury. We have held, for example, that while the President's pardon power may remove all disabilities from one convicted of treason, that power does not extend to an order to repay from the Treasury the proceeds derived from the sale of the convict's forfeited property:

> "So, also, if the proceeds have been paid into the treasury, the right to them has so far become vested in the United States that they can only be secured to the former owner of the property through an act of Congress. Moneys once in the treasury can only be withdrawn by an appropriation by law. However large, therefore,

> may be the power of pardon possessed by the President, and however extended may be its application, there is this limit to it, as there is to all his powers, —it cannot touch moneys in the treasury of the United States, except expressly authorized by act of Congress." *Knote* v. *United States*, 95 U. S. 149, 154 (1877).

Just as the pardon power cannot override the command of the Appropriations Clause, so too judicial use of the equitable doctrine of estoppel cannot grant respondent a money remedy that Congress has not authorized. See *INS* v. *Pangilinan*, 486 U. S. 875, 883 (1988) ("'Courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law'").

We have not had occasion in past cases presenting claims of estoppel against the Government to discuss the Appropriations Clause, for reasons that are apparent. Given the strict rule against estoppel applied as early as 1813 in *Lee* v. *Munroe & Thornton*, 7 Cranch 366, claims of estoppel could be dismissed on that ground without more. In our cases following *Montana* v. *Kennedy*, 366 U. S. 308 (1961), reserving the possibility that estoppel might lie on some facts, we have held only that the particular facts presented were insufficient. As discussed *supra*, at 423–424, we decline today to accept the Solicitor General's argument for an across-the-board no-estoppel rule. But this makes it all the more important to state the law and to settle the matter of estoppel as a basis for money claims against the Government.

Our decision is consistent with both the holdings and the rationale expressed in our estoppel precedents. Even our recent cases evince a most strict approach to estoppel claims involving public funds. See *Community Health Services*, 467 U. S., at 63 ("Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law"). The course of our jurisprudence shows why: Opinions have differed on whether this Court has ever accepted an estoppel claim in other contexts, see *id.*,

at 60 (suggesting that *United States* v. *Pennsylvania Industrial Chemical Corp.*, 411 U. S. 655 (1973) *(PICCO)*, was decided on estoppel grounds); 467 U. S., at 68 (opinion of REHNQUIST, J.) *(PICCO* not an estoppel case), but not a single case has upheld an estoppel claim against the Government for the payment of money. And our cases denying estoppel are animated by the same concerns that prompted the Framers to include the Appropriations Clause in the Constitution. As Justice Story described the Clause:

> "The object is apparent upon the slightest examination. It is to secure regularity, punctuality, and fidelity, in the disbursements of the public money. As all the taxes raised from the people, as well as revenues arising from other sources, are to be applied to the discharge of the expenses, and debts, and other engagements of the government, it is highly proper, that congress should possess the power to decide how and when any money should be applied for these purposes. If it were otherwise, the executive would possess an unbounded power over the public purse of the nation; and might apply all its moneyed resources at his pleasure. The power to control and direct the appropriations, constitutes a most useful and salutary check upon profusion and extravagance, as well as upon corrupt influence and public peculation. . . ." 2 Commentaries on the Constitution of the United States § 1348 (3d ed. 1858).

The obvious practical consideration cited by Justice Story for adherence to the requirement of the Clause is the necessity, existing now as much as at the time the Constitution was ratified, of preventing fraud and corruption. We have long ago accepted this ground as a reason that claims for estoppel cannot be entertained where public money is at stake, refusing to "introduce a rule against an abuse, of which, by improper collusions, it would be very difficult for the public to protect itself." *Lee, supra,* at 370. But the Clause has a more fundamental and comprehensive purpose, of direct rele-

vance to the case before us. It is to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants.

Extended to its logical conclusion, operation of estoppel against the Government in the context of payment of money from the Treasury could in fact render the Appropriations Clause a nullity. If agents of the Executive were able, by their unauthorized oral or written statements to citizens, to obligate the Treasury for the payment of funds, the control over public funds that the Clause reposes in Congress in effect could be transferred to the Executive. If, for example, the President or Executive Branch officials were displeased with a new restriction on benefits imposed by Congress to ease burdens on the fisc (such as the restriction imposed by the statutory change in this case) and sought to evade them, agency officials could advise citizens that the restrictions were inapplicable. Estoppel would give this advice the practical force of law, in violation of the Constitution.

It may be argued that a rule against estoppel could have the opposite result, that the Executive might frustrate congressional intent to appropriate benefits by instructing its agents to give claimants erroneous advice that would deprive them of the benefits. But Congress may always exercise its power to expand recoveries for those who rely on mistaken advice should it choose to do so. In numerous other contexts where Congress has been concerned at the possibility of significant detrimental reliance on the erroneous advice of Government agents, it has provided appropriate legislative relief. See, *e. g.*, Federal Election Campaign Act of 1971, 2 U. S. C. §§ 437f and 438(e); Federal Trade Commission Act, 15 U. S. C. § 57b–4; Securities Act of 1933, 15 U. S. C. § 77s(a); Truth in Lending Act, 15 U. S. C. § 1640(f); Portal-to-Portal Act of 1947, 29 U. S. C. § 259; Employee Retirement Income Security Act of 1974, 29 U. S. C. § 1028; Tech-

nical and Miscellaneous Revenue Act of 1988, Pub. L. 100–647, § 8018, 102 Stat. 3794.

One example is of particular relevance. In *Schweiker* v. *Hansen*, 450 U. S. 785 (1981), we rejected an estoppel claim made by a Social Security claimant who failed to file a timely written application for benefits as required by the relevant statute. Congress then addressed such situations in the Budget Reconciliation Act of 1989 by providing that for claims to old age, survivors, and disability insurance, and for supplemental security income:

> "In any case in which it is determined to the satisfaction of the Secretary that an individual failed as of any date to apply for monthly insurance benefits under this title by reason of misinformation provided to such individual by any officer or employee of the Social Security Administration relating to such individual's eligibility for benefits under this title, such individual shall be deemed to have applied for such benefits on the later of [the date on which the misinformation was given or the date upon which the applicant became eligible for benefits apart from the application requirement]." Pub. L. 101–239, § 10302, 103 Stat. 2481.

The equities are the same whether executive officials' erroneous advice has the effect of frustrating congressional intent to withhold funds or to pay them. In the absence of estoppel for money claims, Congress has ready means to see that payments are made to those who rely on erroneous Government advice. Judicial adoption of estoppel based on agency misinformation would, on the other hand, vest authority in these agents that Congress would be powerless to constrain.

The provisions of the Federal Tort Claims Act (FTCA), 28 U. S. C. §§ 1346(b), 2671 *et seq.*, also provide a strong indication of Congress' general approach to claims based on governmental misconduct, and suggest that it has considered and rejected the possibility of an additional exercise of its appropriation power to fund claims similar to those advanced here.

The FTCA provides authorization in certain circumstances for suits by citizens against the Federal Government for torts committed by Government agents. Yet the FTCA by its terms excludes both negligent and intentional misrepresentation claims from its coverage. See § 2680(h). The claim brought by respondent is in practical effect one for misrepresentation, despite the application of the "estoppel" label. We would be most hesitant to create a judicial doctrine of estoppel that would nullify a congressional decision against authorization of the same class of claims.

Indeed, it would be most anomalous for a judicial order to require a Government official, such as the officers of OPM, to make an extrastatutory payment of federal funds. It is a federal crime, punishable by fine and imprisonment, for any Government officer or employee to knowingly spend money in excess of that appropriated by Congress. See 31 U. S. C. §§ 1341, 1350. If an executive officer on his own initiative had decided that, in fairness, respondent should receive benefits despite the statutory bar, the official would risk prosecution. That respondent now seeks a court order to effect the same result serves to highlight the weakness and novelty of his claim.

The whole history and practice with respect to claims against the United States reveals the impossibility of an estoppel claim for money in violation of a statute. Congress' early practice was to adjudicate each individual money claim against the United States, on the ground that the Appropriations Clause forbade even a delegation of individual adjudicatory functions where payment of funds from the Treasury was involved. See W. Cowen, P. Nichols, & M. Bennett, The United States Court of Claims, A History, 216 Ct. Cl. 1, 5 (1978). As the business of the Federal Legislature has grown, Congress has placed the individual adjudication of claims based on the Constitution, statutes, or contracts, or on specific authorizations of suit against the Government, with the Judiciary. See, *e. g.*, the Tucker Act, 28 U. S. C.

§§ 1346, 1491. But Congress has always reserved to itself the power to address claims of the very type presented by respondent, those founded not on any statutory authority, but upon the claim that "the equities and circumstances of a case create a moral obligation on the part of the Government to extend relief to an individual." Subcommittee on Administrative Law and Governmental Relations of the House Committee on the Judiciary, Supplemental Rules of Procedure for Private Claims Bills, 101st Cong., 1st Sess., 2 (Comm. Print 1989).

In so-called "congressional reference" cases, Congress refers proposed private bills to the United States Claims Court for an initial determination of the merits of the claim, but retains final authority over the ultimate appropriation. See 28 U. S. C. §§ 1492, 2509(c). Congress continues to employ private legislation to provide remedies in individual cases of hardship. See, *e. g.*, Priv. L. 99–3, 100 Stat. 4314, and 131 Cong. Rec. 9675 (1985) (waiving statutory deadline under 5 U. S. C. § 8337(d) where petitioner failed to make timely application due to misinformation of Government personnel officer); Priv. L. 100–37, 102 Stat. 4860, and H. R. Rep. No. 291, 100th Cong., 1st Sess. (1987) (awarding funds lost by servicemen who joined wrong retirement plan in reliance on erroneous advice). Where sympathetic facts arise, cf. *post*, at 435–436 (STEVENS, J., concurring in judgment), these examples show the means by which those facts can be addressed. In short, respondent asks us to create by judicial innovation an authority over funds that is assigned by the Constitution to Congress alone, and that Congress has not seen fit to delegate.

Congress has, of course, made a general appropriation of funds to pay judgments against the United States rendered under its various authorizations for suits against the Government, such as the Tucker Act and the FTCA. See 31 U. S. C. § 1304. But respondent's claim for relief does not arise under any of these provisions. Rather, he sought and ob-

tained an order of enrollment in the disability annuity plan, 5 U. S. C. § 8337, in direct violation of that plan's requirements. See 862 F. 2d, at 301 (remanding respondent's case to the MSPB "with instructions to direct the agency to issue the withheld disability benefits to Mr. Richmond").

The general appropriation for payment of judgments, in any event, does not create an all-purpose fund for judicial disbursement. A law that identifies the source of funds is not to be confused with the conditions prescribed for their payment. Rather, funds may be paid out only on the basis of a judgment based on a substantive right to compensation based on the express terms of a specific statute. This principle is set forth in our leading case on jurisdiction over claims against the Government, *United States* v. *Testan*, 424 U. S. 392 (1976). As stated in JUSTICE BLACKMUN's opinion for the Court:

> "Where the United States is the defendant and the plaintiff is not suing for money improperly exacted or retained, the basis of the federal claim—whether it be the Constitution, a statute, or a regulation—does not create a cause of action for money damages unless . . . that basis 'in itself . . . can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" *Id.*, at 401–402.

Given this rule, as well as our many precedents establishing that authorizations for suits against the Government must be strictly construed in its favor, see, *e. g.*, *Library of Congress* v. *Shaw*, 478 U. S. 310, 318 (1986); *McMahon* v. *United States*, 342 U. S. 25, 27 (1951), we cannot accept the suggestion, *post*, at 438–440 (MARSHALL, J., dissenting), that the terms of a statute should be ignored based on the facts of individual cases. Here the relevant statute by its terms excludes respondent's claim, and his remedy must lie with Congress.

Respondent would have us ignore these obstacles on the ground that estoppel against the Government would have beneficial effects. But we are unwilling to "tamper with

these established principles because it might be thought that they should be responsive to a particular conception of enlightened governmental policy." *Testan, supra,* at 400. And respondent's attempts to justify estoppel on grounds of public policy are suspect on their own terms. Even short of collusion by individual officers or improper executive attempts to frustrate legislative policy, acceptance of estoppel claims for Government funds could have pernicious effects. It ignores reality to expect that the Government will be able to "secure perfect performance from its hundreds of thousands of employees scattered throughout the continent." *Hansen* v. *Harris,* 619 F. 2d 942, 954 (CA2 1980) (Friendly, J., dissenting), rev'd *sub nom. Schweiker* v. *Hansen,* 450 U. S. 785 (1981). To open the door to estoppel claims would only invite endless litigation over both real and imagined claims of misinformation by disgruntled citizens, imposing an unpredictable drain on the public fisc. Even if most claims were rejected in the end, the burden of defending such estoppel claims would itself be substantial.

Also questionable is the suggestion that if the Government is not bound by its agents' statements, then citizens will not trust them and will instead seek private advice from lawyers, accountants, and others, creating wasteful expenses. Although mistakes occur, we may assume with confidence that Government agents attempt conscientious performance of their duties and in most cases provide free and valuable information to those who seek advice about Government programs. A rule of estoppel might create not more reliable advice, but less advice. See *Hansen, supra,* at 788–789, and n. 5. The natural consequence of a rule that made the Government liable for the statements of its agents would be a decision to cut back and impose strict controls upon Government provision of information in order to limit liability. Not only would valuable informational programs be lost to the public, but the greatest impact of this loss would fall on those of limited means, who can least afford the alternative of

private advice.   See Braunstein, In Defense of a Traditional Immunity—Toward an Economic Rationale for Not Estopping the Government, 14 Rutgers L. J. 1 (1982).   The inevitable fact of occasional individual hardship cannot undermine the interest of the citizenry as a whole in the ready availability of Government information.   The rationale of the Appropriations Clause is that if individual hardships are to be remedied by payment of Government funds, it must be at the instance of Congress.

Respondent points to no authority in precedent or history for the type of claim he advances today.   Whether there are any extreme circumstances that might support estoppel in a case not involving payment from the Treasury is a matter we need not address.   As for monetary claims, it is enough to say that this Court has never upheld an assertion of estoppel against the Government by a claimant seeking public funds. In this context there can be no estoppel, for courts cannot estop the Constitution.   The judgment of the Court of Appeals is

*Reversed.*

JUSTICE WHITE, with whom JUSTICE BLACKMUN joins, concurring.

I agree that the Government may not be estopped in cases such as this one and therefore join the opinion and judgment of the Court.   I write separately to note two limitations to the Court's decision.   First, the Court wisely does not decide that the Government may not be estopped under any circumstances.   *Ante,* at 423.   In my view, the case principally relied on by respondent, *United States* v. *Pennsylvania Industrial Chemical Corp.,* 411 U. S. 655 (1973) *(PICCO),* may well have been decided on the basis of estoppel.   But there is a world of difference between *PICCO* and this case: In *PICCO,* the courts were asked to prevent the Government from exercising its lawful discretionary authority in a particular case whereas here the courts have been asked to require the Executive Branch to violate a congressional stat-

ute.   The Executive Branch does not have the dispensing power on its own, see *Kendall* v. *United States ex rel. Stokes*, 12 Pet. 524, 613 (1838), and should not be granted such a power by judicial authorization.

Second, although the Court states that "[a]ny exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury," *ante*, at 425, the Court does not state that statutory restrictions on appropriations may never fall even if they violate a command of the Constitution such as the Just Compensation Clause, cf. *Jacobs* v. *United States*, 290 U. S. 13 (1933), or if they encroach on the powers reserved to another branch of the Federal Government.   Although *Knote* v. *United States*, 95 U. S. 149, 154 (1877), held that the President's pardon power did not extend to the appropriation of moneys in the Treasury without authorization by law for the benefit of pardoned criminals, it did not hold that Congress could impair the President's pardon power by denying him appropriations for pen and paper.

JUSTICE STEVENS, concurring in the judgment.

Although I join the Court's judgment, I cannot accept its reasoning.   The Appropriations Clause of the Constitution has nothing to do with this case.   Payments of pension benefits to retired and disabled federal servants are made "in Consequence of Appropriations made by Law" even if in particular cases they are the product of a mistaken interpretation of a statute or regulation.   The Constitution contemplates appropriations that cover programs—not individual appropriations for individual payments.   The Court's creative reliance on constitutional text is nothing but a red herring.

The dispute in this case is not about whether an appropriation has been made; it is instead about what rules govern administration of an appropriation that has been made.   Once the issue is appropriately framed, it quickly becomes obvious

that the Court's resolution of it is untenable. · Three hypothetical changes in the facts of this case will illustrate the error in the Court's approach. Assume, first, that the forfeiture involved a permanent and total loss of pension benefits rather than a 6-month hiatus. Suppose also that respondent was a disabled serviceman, totally incapable of productive work, who was promised that his benefits would be unaffected if he enlisted in the Reserve forces to show his continuing commitment to his country. Finally, assume that respondent was activated briefly for the sole purpose of enhancing his earnings, thereby depriving him of his pension permanently. Would the Court apply the harsh rule against estoppel that it announces today? I think not. Unless it found in the statute some unambiguous abrogation of estoppel principles, the Court would apply them to nullify the forfeiture. In doing so, the Court would construe the statute in a way consistent with congressional intent and would ensure that the Executive administered the funds appropriated in a manner consistent with the terms of the appropriation.

This case, however, does not involve such extreme facts. Respondent's loss of benefits was serious but temporary, and, even if we assume that respondent was not adequately compensated for the stress of his increased workload, his additional earnings certainly mitigated the shortfall in benefits. I agree with JUSTICE MARSHALL that there are strong equities favoring respondent's position, but I am persuaded that unless the 5-to-4 decision in *Federal Crop Ins. Corporation v. Merrill*, 332 U. S. 380 (1947), is repudiated by Congress or this Court, this kind of maladministration must be tolerated. I think the case is closer to *Schweiker* v. *Hansen*, 450 U. S. 785 (1981), and *Heckler* v. *Community Health Services of Crawford County, Inc.*, 467 U. S. 51 (1984), than to *Moser* v. *United States*, 341 U. S. 41 (1951), and *United States* v. *Pennsylvania Industrial Chemical Corp.*, 411 U. S. 655 (1973). Accordingly, I concur in the Court's judgment but not its opinion.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

Respondent, a recipient of a federal disability annuity, was unsure whether he could accept limited overtime work without forfeiting his right to disability payments. He went to his former Government employer seeking an answer, asked the right questions, received an answer in the form of both oral advice and an official Government publication, and relied on that answer. Unfortunately, the publication the Government gave Richmond was years out of date, and the oral information was similarly erroneous. In this case, we must decide who should bear the burden of the Government's error.

The majority hints that it is unsympathetic to Richmond's claim that he was treated unfairly, *ante*, at 416, but it does not rule on that basis. Rather, the majority resolves the issue by holding as a general rule that a litigant may not succeed on a claim for payment of money from the Treasury in the absence of a statutory appropriation. Although the Constitution generally forbids payments from the Treasury without a congressional appropriation,* that proposition does not resolve this case. Most fundamentally, Richmond's collection of disability benefits would be fully consistent with the relevant appropriation. And even if the majority is correct that the statute cannot be construed to appropriate funds for claimants in Richmond's position, petitioner may nonetheless be estopped, on the basis of its prelitigation conduct, from arguing that the Appropriations Clause bars his recovery. Both the statutory construction and the estoppel arguments

---

*The Court does not decide whether the Appropriations Clause would bar the Judiciary from ordering payments from the Treasury contrary to a statutory appropriation either where such payment would be required to remedy a violation of another constitutional provision, such as the Due Process or Just Compensation Clause, or where Congress' refusal to appropriate funds would violate separation of powers. See *ante*, at 434–435 (WHITE, J., concurring) (noting this limitation on the Court's holding).

turn on the equities, and the equities favor Richmond, see 862 F. 2d 294, 299 (CA Fed. 1988). I therefore dissent.

## I

As the majority notes, the Appropriations Clause generally bars recovery from the Treasury unless the money sought "'has been appropriated by an act of Congress.'" *Ante*, at 424 (quoting *Cincinnati Soap Co.* v. *United States*, 301 U. S. 308, 321 (1937)). The majority acknowledges that Congress *has* appropriated funds to pay disability annuities in 5 U. S. C. §8348(a), *ante*, at 424, but holds that the fund created is intended for the payment of benefits only "as provided by" law, *ante*, at 424 (quoting §8348(a)(1)(A)). Section 8337(d) provides that a disability annuity terminates when the annuitant's earning capacity is restored and that such capacity is "deemed restored" if in any calendar year the annuitant makes more than 80% of the current rate of pay of the position he left. The majority contends on the basis of this provision that paying benefits to an annuitant who has exceeded the 80% limit would violate the Appropriations Clause because such benefits are not "provided by" the statute.

The Court need not read the statute so inflexibly, however. When Congress passes a law to provide a benefit to a class of people, it intends and assumes that the Executive will fairly implement that law. Where necessary to effectuate Congress' intent that its statutory schemes be fully implemented, this Court therefore often interprets the apparently plain words of a statute to allow a claimant to obtain relief where the statute on its face would bar recovery. Indeed, petitioner itself suggests that the Court was engaging in just such a brand of statutory interpretation in *Moser* v. *United States*, 341 U. S. 41, 47 (1951). Brief for Petitioner 40; Reply Brief for Petitioner 7. The relevant statute in *Moser* provided that a request by an alien for exemption from military service precluded him from becoming a citizen. 341 U. S., at 42–43, n. 5 (quoting 55 Stat. 845, 50 U. S. C. App.

§ 303(a) (1946 ed.)). The Court interpreted the statute to mean that, "as a matter of law, the statute imposed a valid condition on the claim of a neutral alien for exemption; petitioner had a choice of exemption and no citizenship, or no exemption and citizenship." 341 U. S., at 46. Moser was erroneously informed by the State Department that a claim for exemption would not bar him from later obtaining citizenship, and he relied on that advice. *Ibid.* In those circumstances, the Court decided, despite the absence of any such provision on the face of the statute, that "nothing less than an intelligent waiver [of the right to citizenship] is required by elementary fairness." *Id.*, at 47. The Court therefore held that Moser's claim for exemption did not bar him from later becoming a citizen.

*Moser* was not an aberration. Where strict adherence to the literal language of the statute would produce results that Congress would not have desired, this Court has interpreted other statutes to authorize equitable exceptions though the plain language of the statute suggested a contrary result. In *Zipes* v. *Trans World Airlines, Inc.*, 455 U. S. 385 (1982), for example, we held that a statute requiring that a plaintiff file a suit under Title VII of the Civil Rights Act of 1964 (Title VII) within 90 days of the alleged unlawful employment practice was "subject to waiver, estoppel, and equitable tolling." *Id.*, at 393 (footnote omitted). See also, *e. g.*, *Hallstrom* v. *Tillamook County*, 493 U. S. 20, 27 (1989). Similarly, in *Crown, Cork & Seal Co.* v. *Parker*, 462 U. S. 345 (1983), we interpreted Title VII's requirement that suits be filed within 90 days of receiving a notice of right to sue from the Equal Employment Opportunity Commission to be subject to tolling in appropriate circumstances, notwithstanding that the statute on its face did not allow exceptions. See also *Burnett* v. *New York Central R. Co.*, 380 U. S. 424 (1965) (limitations provision in Federal Employers' Liability Act is subject to tolling).

Respect for Congress' purposes in creating the federal disability annuity system and principles of elementary fairness require that we read the statute in this case as not barring Richmond's claim. Perhaps "[t]he equities do not weigh in favor of modifying statutory requirements when the procedural default is caused by petitioners' 'failure to take the minimal steps necessary' to preserve their claims." *Hallstrom, supra*, at 27–28 (quoting *Johnson* v. *Railway Express Agency, Inc.*, 421 U. S. 454, 466 (1975)). But the equities surely *do* weigh in favor of reading the disability annuity statute to authorize payment of the claim of an annuitant rendered ineligible for benefits by his reliance on misinformation from the responsible federal authorities. Cf. *Baldwin County Welcome Center* v. *Brown*, 466 U. S. 147, 151 (1984) (suggesting that a party should not be able to claim that a statute of limitations bars a suit "where affirmative misconduct on the part of a defendant lulled the plaintiff into inaction").

## II

Even if the majority is correct that the statute does not itself require an exception where the Executive has misled a claimant, Richmond should still prevail. Although petitioner has an Appropriations Clause argument against any claim for money not authorized by a statutory appropriation, a court is not invariably required to entertain that argument. A number of circumstances may operate to estop the Government from invoking the Appropriations Clause in a particular case. For example, this Court's normal practice is to refuse to consider arguments not presented in the petition for certiorari. See, *e. g., Radio Officers* v. *NLRB*, 347 U. S. 17, 37, n. 35 (1954). This Court customarily applies a similar rule to questions that were not raised in the Court of Appeals. See, *e. g., Delta Air Lines, Inc.* v. *August*, 450 U. S. 346, 362 (1981). These rules apply to *all* arguments, even those of constitutional dimension. See, *e. g., Holland* v. *Illinois*, 493 U. S. 474, 487, n. 3 (1990) (refusing to consider

equal protection claim on the ground that it was not presented in petition for certiorari). Thus, had petitioner failed to raise the argument on which it now prevails either in its petition for certiorari or in the Court of Appeals, we likely would have refused to consider it. Of course, we would have had the power to consider the claim. See, *e. g., Teague* v. *Lane*, 489 U. S. 288, 300 (1989) (deciding case on basis of argument "raised only in an *amicus* brief"). We would not, however, have been obligated to do so.

The grounds on which a court may refuse to entertain an argument are many, but most have an equitable dimension. The courts' general refusal to consider arguments not raised by the parties, for example, is founded in part on the need to ensure that each party has fair notice of the arguments to which he must respond. Cf. *ibid.* (justifying departure from rule that arguments not raised by parties will not be considered in part on grounds that issue was raised in *amicus* brief and that argument was "not foreign to the parties, who have addressed [the argument] with respect to [another of petitioner's claims]"). Thus, the Appropriations Clause's bar against litigants' collection of money from the Treasury where payment is not authorized by statute may not be enforced in a particular case if a court determines that the equities counsel against entertaining the Government's Appropriations Clause argument.

The question here is thus similar to ones that we have posed and answered in any number of recent cases, see *ante*, at 421–422 (summarizing cases): should petitioner *in this case* be barred from invoking the statutory eligibility requirement (and through it, the Appropriations Clause) because Richmond's ineligibility for benefits was due entirely to the Government's own error? The majority refuses to answer this question. The Court of Appeals addressed it directly, concluding that the facts in this case were so "unusual and extreme" that petitioner should be estopped from applying the

statutory restrictions to bar Richmond's recovery. I agree with the Court of Appeals' ruling.

### III

The majority argues that policy concerns justify its general refusal to apply estoppel against the Government in cases in which a claimant seeks unappropriated funds from the Treasury. Such a rule is necessary, says the majority, to protect against "fraud and corruption" by Executive Branch officials. *Ante*, at 427. If such officials are "displeased" with a statute, the argument goes, they may misinform the public as to the statute's meaning, thereby binding the Government to the officials' representations. *Ante*, at 428. The majority's concern with such dangers is undercut, however, by its observation that "Government agents attempt conscientious performance of their duties." *Ante*, at 433. The majority also contends that even if most claims of equitable estoppel are rejected in the end, "open[ing] the door" to such claims would impose "an unpredictable drain on the public fisc." *Ante*, at 433. The door has been open for almost 30 years, with an apparently unnoticeable drain on the public fisc. This reality is persuasive evidence that the majority's fears are overblown.

Significant policy concerns would of course be implicated by an indiscriminate use of estoppel against the Government. But estoppel is an equitable doctrine. As such, it can be tailored to the circumstances of particular cases, ensuring that fundamental injustices are avoided without seriously endangering the smooth operation of statutory schemes. In this case, the Federal Circuit undertook a thorough examination of the circumstances and concluded that denying Richmond his pension simply because he followed the Government's advice would be fundamentally unjust.

The majority does not reject the court's findings on the facts but rejects Richmond's claim on the theory that, except where the Constitution requires otherwise, see n., *supra*,

equitable estoppel may not be applied against the Government where the claimant seeks unappropriated funds from the Treasury. This Court has never so much as mentioned the Appropriations Clause in the context of a discussion of equitable estoppel, cf., *e. g.*, *Heckler* v. *Community Health Services of Crawford County, Inc.*, 467 U. S. 51, 60 (1984) (considering constitutional objections to applying estoppel against the Government in context of claim for payment from the Treasury contrary to an appropriation, but nowhere mentioning the Appropriations Clause), nor has the majority's theory ever before been discussed, much less adopted, by any court. This lack of precedent for the majority's position is not surprising because the Appropriations Clause does not speak either to the proper interpretation of any statute or to the question whether the Government should be estopped from invoking the Clause in a particular case. I dissent.