In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-2011

JOSE LUIS GUTIERREZ,

*Petitioner,*

*v.*

ALBERTO R. GONZALES,

*Respondent.*

On Petition for Review of an Order
of the Board of Immigration Appeals.
No. A76-249-822

ARGUED JANUARY 13, 2006—DECIDED AUGUST 16, 2006

Before RIPPLE, KANNE, and ROVNER, *Circuit Judges.*

KANNE, *Circuit Judge.* Gary M. Spraker, an attorney, engaged in a pattern of misconduct in immigration cases, which, according to the Indiana Supreme Court Disciplinary Commission, "tainted the representation of some 50 clients, many of whom faced imminent legal consequences attaching to their entitlement to stay in this country."[1] Petitioner Jose Luis Gutierrez was one of those so aggrieved when Spraker

---

[1] Effective April 23, 2001, Spraker was suspended from the practice of law for two years without automatic reinstatement. *In re Spraker*, 744 N.E.2d 415 (Ind. 2001). As of the date of this opinion, Spraker remains suspended.

filed on his behalf a baseless application for adjustment of status to that of a lawful permanent resident. The result of the petition was that Gutierrez was outed as an illegal immigrant and then ordered deported. Gutierrez now petitions us for various forms of relief based upon his argument that the government should be estopped from acting on the basis of the information provided in Gutierrez's doomed application for permanent residency. We deny the petition.

## I. HISTORY

Around 1994, Gutierrez, who had entered the country illegally in 1986, began hearing rumors of a new law providing permanent residency to "aliens" who previously could not obtain it. *See* 8 U.S.C. § 1101(a)(3). Like most rumors, there was an element of truth to it. Prior to 1994, aliens present in the United States could petition the Attorney General for an adjustment of status to permanent residency under 8 U.S.C. § 1255(a) if they met certain criteria, one of which was being "eligible to receive an immigrant visa and is admissible to the United States for permanent residence." But aliens here illegally like Gutierrez were specifically prohibited by § 1255(c) from making such a petition from within this country. Their only recourse, assuming they met the other requirements of § 1255, was to return to their home country to apply for permanent residency. *See* 8 U.S.C. § 1154(a)-(b).

In 1994, Congress temporarily removed the bar present in § 1255(c) by enacting § 1255(i),which allowed those here illegally to apply for permanent residency from within the United States, thereby relieving applicants of the burden of returning first to their home country. But this amendment did not do away with the *other* requirements of § 1255(a), which included being eligible to receive an immigrant visa and being admissible for permanent

residency. Like many of the aliens in this country illegally in 1994, Gutierrez did not meet these other requirements. Thus, the 1994 amendment removing the bar to applying for permanent residency for those living in the country illegally was of absolutely no benefit to Gutierrez and others like him because they could not meet the section's other requirements.

Nevertheless, it is reasonable to assume, as Gutierrez argues, that a "frenzy" was created in the immigrant community by the 1994 amendment. Complex federal statutes can give seasoned lawyers headaches, so it is no wonder that even a limited liberalization of the application procedures under § 1255 might filter its way down to those not so well acquainted with the law as something much greater than it really was. And any frenzy was likely heightened by the fact that under the regulatory scheme, applicants for adjustment under § 1255(a) were routinely authorized to work legally under an employment authorization document ("EAD") while the application was being processed. *See* 8 C.F.R. §§ 274a.12(c)(9), 274a.13(a)(1). Thus, upon filing an application under § 1255(a)—even applications like Gutierrez's that would never garner approval—the government would issue an EAD for use while the application was being processed. That kind of instant gratification would quite likely fuel an application frenzy as illegal immigrants see their peers being given authorization to work.

Attorneys like Spraker and other professionals benefitted from this situation through either connivance or incompetence. They charged fees to file baseless applications under § 1255(a) for immigrants like Gutierrez who were not eligible for such relief. The result for the immigrants was a much appreciated EAD, followed by a not-so-appreciated Notice to Appear ("NTA") for removal proceedings. Gutierrez received his EAD in December of 1996, and his NTA was dated April 21, 1998.

After receiving the NTA, Gutierrez had no choice but to appear before an immigration judge and concede that he was removable as charged. His next step was to move for cancellation of removal pursuant to 8 U.S.C. § 1229b(b),which allows the Attorney General to award otherwise deportable persons permanent residency if they meet certain requirements. Gutierrez requested this relief because of the hardship his forced deportation would have on his four U.S. citizen daughters (then ranging in age from eight to eleven). We can assume that Gutierrez met all the requirements but one: a sufficiently clean criminal record, which eluded Gutierrez because of his convictions for unlawful use of a weapon and battery. *See* 8 U.S.C. § 1229b(b). Thus, Gutierrez was not eligible to petition for cancellation of removal. In this regard, it was unfortunate for Gutierrez that the government did not initiate removal proceedings before April 1, 1997, the effective date of the changes in the immigration law that made Gutierrez's criminal record a bar to cancellation of removal.

In 2000, the immigration judge continued Gutierrez's hearing to allow him to address his criminal convictions. Gutierrez's response was to abandon his attempt at cancellation of removal and instead file a motion to terminate the removal proceedings, which was denied by the immigration judge. Because Gutierrez had no other basis upon which to contest his deportation, the order denying the motion to terminate also included an order that Gutierrez be deported. The Board of Immigration Appeals affirmed without opinion, and we are now left to decide whether the issues Gutierrez raised in his motion to terminate, and reargued before us, entitle him to any relief.

## II. ANALYSIS

With this background in mind, we can summarize Gutierrez's argument on appeal: the government should

be equitably estopped from deporting him because it committed "affirmative misconduct" when it accepted his obviously deficient application rather than returning it unfiled without taking any notice of Gutierrez's illegal status. Moreover, the government then purposely waited to initiate deportation proceedings until after April 1, 1997, the date changes in the immigration law created a statutory bar to Gutierrez's petition for cancellation of removal. The undeniable conclusion to be drawn, Gutierrez argues, is that the government engaged in a conspiracy with attorneys like Spraker to fish for information regarding illegal immigrants and to wait to initiate deportation proceedings until the new law made it impossible for aliens to contest deportation.

Gutierrez admits that equitable estoppel is generally not available to bar the government from enforcing the laws. This concession, however, drastically understates the difficulty he faces. The Supreme Court has *never* affirmed a finding of estoppel against the government. And that is not for lack of review. The Court, in fact, has "reversed every finding of estoppel that [it has] reviewed." *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 422 (1990). As the Court explained in *Richmond*, three of the most recent (meaning within the last thirty years or so) of those were summary reversals, a circumstance it admitted was "unusual under any circumstances." *Id.* Concerned that it had not provided sufficient guidance to the courts of appeals in this area of equitable estoppel against the government, the Court took the opportunity in *Richmond* to review its precedent. As should be clear from what we have already said, that precedent is not favorable to Gutierrez. *Id.* at 419-23. The Court also remarked, as it had before, that the arguments made in that case for a blanket rule that estoppel would never lie against the government were "'substantial.'" *Id.* at 423 (quoting *Heckler v. Cmty. Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 60 (1984)).

Nevertheless, the Court decided *Richmond* on grounds other than estoppel, while leaving "for another day whether an estoppel claim could ever succeed against the Government." *Id.* at 423.

Thus, the door may still be open to Gutierrez's claim of estoppel, but there is not enough in this record to make the extraordinary finding that the government is estopped from enforcing the immigration laws. Neither party addresses the traditional elements of estoppel. *See Heckler*, 467 U.S. at 60 (explaining that a "private party surely cannot prevail [in asserting estoppel against the government] without at least demonstrating that the traditional elements of an estoppel are present"). Instead, both Gutierrez and the government focus on whether the government committed affirmative misconduct, which would be necessary before the government could be estopped from enforcing the law. *Gibson v. West*, 201 F.3d 990, 994 (7th Cir. 2000) (citation omitted); *Mendoza-Hernandez v. INS*, 664 F.2d 635, 639 (7th Cir. 1981) (citations omitted).

We can easily dispose of his argument that the timing of his NTA amounts to affirmative misconduct. The time between the filing of Gutierrez's application (December 1996) and the change in the law making it impossible for him to petition for cancellation of removal (April 1, 1997) was at most four months. We are not sure that this can accurately be described as a delay, given that at that time there was what Gutierrez himself describes as a "frenzy" of filings. In any event, it is an unexplained delay, which quite clearly cannot form the basis of an estoppel argument against the government. *INS v. Miranda*, 459 U.S. 14, 19 (1982) ("Proof only that the Government failed to process promptly an application falls far short of establishing [affirmative misconduct].").

We are also not swayed by Gutierrez's core argument: that the government committed affirmative misconduct

when it used the information in Gutierrez's obviously deficient application to initiate removal proceedings against him. Central to this argument is Gutierrez's contention that the government violated its own regulations, namely, 8 C.F.R. §§ 103.2(a)(7) and 245.2(a)(2)(i), by not immediately returning his application. The immigration judge found that there was no regulatory violation in the government's conduct because Gutierrez's application did "not fall within [the] category of applications that must be returned."[2] We reached the same conclusion under similar facts in *Lopez-Chavez v. Ashcroft*, 383 F.3d 650, 654 (7th Cir. 2004), where we explained that the applicable regulations only required return of the applications submitted "simultaneously with an immediate relative petition or a preference petition." *Id.* at 655. While Gutierrez's application is not present in the record, he has made clear that his application contained no grounds for receiving a visa for permanent residency. Therefore, his application was not one that fell within the one circumstance requiring return. Moreover, there is no dispute that Gutierrez's application was one submitted by mail. And as *Lopez-Chavez* again explains, the applicable regulations and operating instructions "stated that applications received *by mail* for which visas were not available *were not* to be returned to applicants." *Id.* (emphasis in original).

---

[2] The immigration judge also found that Gutierrez was not entitled to relief under a line of cases requiring suppression of evidence when the government violates a regulation designed to safeguard individual interests because, among other reasons, the regulations at issue here do not "serve a 'purpose of benefit'" to Gutierrez. *See Lopez-Chavez v. Ashcroft*, 383 F.3d 650, 654 (7th Cir. 2004) (explaining that certain administrative violations might require suppression) (citations omitted). Gutierrez does not take issue with this aspect of the ruling. Instead, he focuses his energies entirely on equitable estoppel.

The litigation in *Ramos v. Chertoff*, No. 02 C 8266 (N.D. Ill. dismissed Aug. 12, 2005), also does not provide evidence that the government violated the law in processing Gutierrez's application. The settlement agreement presumably concluding that case, provided to us by Gutierrez, includes the normal language noting that the government denies any allegation it violated the law. Nor are we swayed by Gutierrez's argument that reading regulations § 103.2(a)(7) and § 245.2(a)(2)(i) together shows a regulatory violation. As the immigration judge found, those regulations are at best silent on what to do with applications like Gutierrez's that did not have a visa immediately available. It may have been better policy for the government to return applications that clearly would never get approved, and it may not have been, but Gutierrez has simply not shown us any law or rule the government violated in processing his application.

The additional information provided by Gutierrez in his reply brief, not present in the record below and considered only for the sake of argument, does not change our conclusion. Admittedly, that evidence includes a memorandum written by an official from what was the Chicago District Office of the INS indicating that applications like Gutierrez's should have been considered "rejectable," and therefore returned, instead of being considered "deniable," in which case the application would be kept and processed. But this one-page memorandum written in outline format does not have the force of law, nor does the memorandum from an INS official, which, in any event, simply states that applications like Gutierrez's should not be denied.[3] It is true that his application was

---

[3]  Guttierez quotes the following language from that memo:

When a Service office has inadvertently processed the filing fee for an application which did not meet the requirements for

(continued...)

eventually denied, but that does not mean the government violated a law when it initiated deportation proceedings against Gutierrez based on the information in his application. This evidence, which includes some deposition testimony, shows that it might have been the Chicago District Office and the INS's policy to return obviously deficient applications like Gutierrez's. But what this evidence does not show is that the law required it.

This brings us to the fundamental reason we are rejecting Gutierrez's estoppel argument: The government's conduct of acting on information provided voluntarily to it indicating a violation of the immigration laws cannot constitute the type of egregious affirmative misconduct necessary to justify the extraordinary remedy of estoppel. This is so even if there was a technical regulatory violation in the processing of Gutierrez's application. If there was any support whatsoever for the hyperbolic charge that the government was affirmatively engaged in a conspiracy to lure illegal immigrants into a trap while lining the pockets of shysters like Spraker, then we might be more inclined to consider estoppel. But there is nothing in this record to support such a charge.

The worst that we can infer from this case is that the government, in response to what it saw as a flood of frivolous applications, decided to use the information being provided to it to initiate deportation proceedings. It might be said that in this situation the government should

---

[3] (...continued)
proper filing, e.g., as when a required immigrant visa is not immediately available and cannot become available by the approval of a pending visa petition, OI 245.2(a) prescribes that the application will not be formally denied; rather, the applicant is notified of the reason why the application is ineligible for filing, and is advised that a refund request is being processed.

have realized that people like Gutierrez were really victims of attorneys like Spraker. But there is no evidence the government came to that conclusion, and even if it had, it does not follow that equity would demand the government be estopped from deporting those who are here without legal permission. Equity, after all, includes the venerable doctrine that "he who comes into equity must come with clean hands." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945) (quotation omitted). While the government has not raised the issue of "unclean hands," the undisputed fact that Gutierrez is in violation of the law is at least relevant to our determination of whether the government committed affirmative misconduct in finding out about him. Equity would not be served, in our view, to estop the government from enforcing knowing violations of the law when it gets proof in the mail.

Whatever the burden might be in demonstrating estoppel against the government, it cannot be met by only showing that the government intentionally designed to act on information voluntarily provided to it indicating a violation of the law. Because we find that estoppel does not lie in this case, we need not consider Gutierrez's various requests for relief. Accordingly, Gutierrez's petition for review is DENIED.

A true Copy:

      Teste:

 

                                _____

                                *Clerk of the United States Court of Appeals for the Seventh Circuit*