**HOSKINS LUMBER CO. INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 323–88 C.

United States Claims Court.

Sept. 25, 1991.

Michael E. Haglund, Portland, Or., for plaintiff.

Kirk T. Manhardt, U.S. Dept. of Justice, Washington, D.C., for defendant.

## OPINION AND ORDER

HODGES, Judge.

This court has jurisdiction of this case pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1988). The parties have filed cross-motions for summary judgment pursuant to RUSCC 56. Because there are no issues of material fact in dispute, disposition in a summary

judgment proceeding is appropriate. Defendant's motion for summary judgment is granted as to liability.

### FACTS

The Griffith Middlefork 78 timber sale contract was awarded to Hoskins Lumber Co. Inc. ("Hoskins") on October 13, 1978 by the United States Forest Service. During the late 1970's and early 1980's, the timber market collapsed. Federal timber contracts became unprofitable and even onerous for many of the companies which held them. Fearing defaults by holders of these contracts and the industry-wide effects which could follow, the Forest Service authorized the Multi–Sale Extension Program.

The program allowed the holders of contracts such as the Griffith contract to file a Multi–Sale Extension Plan (MSEP), by which their contract termination dates could be extended by a maximum of five years. Such a plan would spread the collapsed market's negative impact over a longer period of time, or possibly return the contract to profitability.

The program was instituted after the Secretary of Agriculture, in accordance with 16 U.S.C. § 472a(c) (1988), determined that a substantial, overriding public interest justified contract extensions of up to five years on certain National Forest timber sales. A contractor could apply for an "interim modification" until its MSEP was approved. However, if the contractor were facing immediate termination, a "conditional extension" could be issued which would keep the contract in effect until a MSEP could be approved.

The program was announced in the Federal Register on August 26, 1983 (48 FR 38,862) as an Interim Policy. The Final Notice of Policy was published in the Federal Register on December 7, 1983 (48 FR 54,812). The Final Notice extended the deadline for filing the MSEP to February 15, 1984, and incorporated many of the guidelines set forth in the Interim Policy.

Under the Griffith contract, Hoskins had agreed to cut and remove approximately five million feet of timber by December 31, 1982 from the Suislaw National Forest, Oregon. The contract completion date was extended to December 31, 1984.

In April 1983, North Side Lumber Company filed suit in district court, requesting relief from enforcement of a timber contract on the basis of contractual impracticability. *North Side Lumber Co. v. Block,* Civ. No. 83–490–BU (D.Or.). The suit was subsequently converted into a class action which included Hoskins as a conditionally certified member. On February 15, 1984, the filing deadline for submitting a MSEP, a federal district court in Oregon issued an order enjoining the government:

> (1) from enforcing in any manner the contracts at issue in this action ...; (2) from enforcing the current February 15, 1984 deadline for the submission of a [MSEP] ...; and (3) [granting] the members of plaintiffs' class 30 days following the dissolution of the preliminary injunction to submit and have considered by the [government] a five-year plan....

On February 16, 1984, Hoskins asked the Regional Forester if he interpreted the injunction as allowing Hoskins 30 days after the dissolution of the injunction to file a MSEP. The Regional Forester responded that he did.

On March 21, 1984, the Contracting Officer notified Hoskins that its contract was subject to the injunction. Attached to this notification was a copy of a March 12, 1984 Forest Service memorandum from the Forest Service Deputy Chief. The memo stated that following dissolution of the injunction, purchasers must file a MSEP which meets the standards established in the December 7, 1983 Federal Register notice and the Forest Service Manual. The filing was to be "within the time frames set by the Court."

Hoskins alleges that it purchased other timber contracts based on these assurances and representations, and that the contract would have been completed, if the company had known that it could not file a MSEP. Hoskins had logged approximately two million board feet of timber.

On April 10, 1984, the Contracting Officer executed an "interim modification" based upon Hoskins' intent to submit a Multi–Sale Extension Plan. Hoskins had not filed a MSEP at that time, so plaintiff maintains that the "interim modification" was intended to extend the time for filing. The Forest Service argues that the purpose of the modification was to extend the contract while a MSEP was being considered.

The Contracting Officer notified Hoskins on October 29, 1984, that the Griffith contract would be extended conditionally from the December 31, 1984 termination date until 30 days after the dissolution of the injunction. However, the performance period was not increased because the felling or removal of timber was prohibited while the contract was under "conditional extension."

On February 20, 1985, the Court of Appeals for the 9th Circuit ruled that the *North Side* court lacked subject matter jurisdiction to consider a claim of contractual impracticability. *North Side Lumber Co. v. Block*, 753 F.2d 1482 (9th Cir.1985). While the *North Side* plaintiffs' petition for certiorari was pending, the class members were offered a settlement by which they could file their MSEPs in exchange for dismissal with prejudice. An October 11, 1985 letter from defendant's counsel stated:

> Class members who reject the settlement offered by the government will not be entitled to the benefits of the settlement, nor will they be bound by the terms thereof. Whether they will be permitted to file an MSEP ... will not be determined by the settlement. The Forest Service contends that it does not have to accept MSEP's from class members, except from those who choose to accept and sign the settlement agreement.

Hoskins was asked to join the settlement but declined because the company believed that it was entitled to file pursuant to the terms of the court order. Most of the class action plaintiffs joined the settlement, which was executed on October 31, 1985.

After the petition for certiorari was denied by the Supreme Court, *North Side Lumber Co. v. Block*, 474 U.S. 931, 106 S.Ct. 265, 88 L.Ed.2d 271 (1985), the 9th Circuit issued a November 29, 1985 mandate dissolving the injunction. Hoskins filed its MSEP with the Forest Service on December 27, 1985, 28 days after dissolution of the injunction.

The Contracting Officer notified Hoskins on March 28, 1986 that it was in default. The Forest Service also rejected Hoskins' MSEP because it was filed after February 15, 1984, the deadline set forth in the Federal Register.

After the termination of Hoskins' contract, the Forest Service decided not to resell the timber, citing concern for the Spotted Owl. On March 4, 1988, the Contracting Officer assessed damages against Hoskins in the amount of $234,347.32 pursuant to Clause B9.4 of the contract. Hoskins filed suit on May 31, 1988, seeking dismissal of the damages, costs, and reasonable attorney fees. The government filed a counterclaim for the damages sought by the Contracting Officer pursuant to Clause B9.4 of the contract.

## ARGUMENT

### I. EFFECT OF THE INJUNCTION

Hoskins argues that it is entitled to rely on the court order which allowed filing of the MSEP 30 days after dissolution of the injunction because it was an enforceable order with which the Forest Service was bound to comply. Plaintiff relies on *United States v. United Mine Workers*, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947), in which the government requested a temporary restraining order to prevent a coal mining strike. The court's jurisdiction to issue the order depended upon the applicability of the Norris–LaGuardia Act. The Supreme Court found that the district court had the power to issue the temporary restraining order for the purpose of preserving existing conditions pending resolution of the jurisdictional issue regarding the court's authority to grant the injunctive relief. *United Mine Workers*, 330 U.S. at 293, 67 S.Ct. at 695.

The Court held that even though the Norris–LaGuardia Act might apply, thereby divesting the district court of jurisdiction, the judgment of criminal contempt for failure to comply with the temporary restraining order would be affirmed. *Id.* at 294, 67 S.Ct. at 696; *see also United States v. Shipp,* 203 U.S. 563, 573, 27 S.Ct. 165, 166, 51 L.Ed. 319 (1906) (district court has authority to make orders to preserve existing conditions pending a decision on the validity of the court's jurisdiction to issue the orders); *Carter v. United States,* 135 F.2d 858 (5th Cir.1943) (though there is later a determination of lack of jurisdiction, an injunction has the force of law during its pendency).

The court in *Latrobe Steel Co. v. United Steelworkers,* 545 F.2d 1336 (3d Cir.1976) drew a distinction between civil and criminal contempt when it found that a charge of civil contempt does not survive a finding that an injunction is invalid. Only a charge of criminal contempt can survive invalidation. *Id.* at 1342. The Court in *United Mine Workers* also made this distinction. 330 U.S. at 295, 67 S.Ct. at 696–97. Therefore, a person who is cited for criminal contempt of a court order may not defend against the charge based upon the invalidity of that order. A party cited for civil contempt may do so. *See also Trans International Airlines, Inc. v. International Brotherhood of Teamsters,* 650 F.2d 949, 955 (9th Cir.1980), *cert. denied,* 449 U.S. 1110, 101 S.Ct. 918, 919, 66 L.Ed.2d 839 (1981); *Scott & Fetzer Co. v. Dile,* 643 F.2d 670, 675 (9th Cir.1981).

"The right to remedial relief falls with an injunction which events prove was erroneously issued ... and a fortiori when the injunction or restraining order was beyond the jurisdiction of the court." *United Mine Workers,* 330 U.S. at 295, 67 S.Ct. at 696–97. Plaintiff in *Sandler v. Tarr,* like Hoskins, sought enforcement of an order which was issued by a court without jurisdiction. *Sandler v. Tarr,* 345 F.Supp. 612, 621–22 (D.Md.1971), *aff'd per curiam,* 463 F.2d 1096 (4th Cir.1972), *cert. denied,* 409 U.S. 990, 93 S.Ct. 321, 34 L.Ed.2d 257 (1972). In denying Sandler's request the district court stated that it is one thing to say that an order must be obeyed before it is dissolved. It is quite another to say that relief may be based on the fact that the order had existed at an earlier time. *Sandler,* 345 F.Supp. at 621–22.

The Department of Agriculture Board of Contract Appeals in a case nearly identical to the present one denied another *North Side* plaintiff's motion for summary judgment on this issue. *Moore Mill & Lumber Co.,* AGBCA # 87–172–1, 89–1 BCA (CCH) ¶ 21,572 at 108,643, 1989 WL 13041. The Board stated, "To give effect to the injunction after it had been vacated by reason of invalidity ... would be tantamount to conferring ... benefits similar to those [the contractor] was unable to obtain through its litigation." *Moore Mill,* 89–1 BCA (CCH) ¶ 21,572 at 108,643–44. Moore Mill appealed this decision to the Federal Circuit; however, on June 4, 1991, the appeal was dismissed upon agreement of the parties.

Giving effect to an order issued by a court without jurisdiction violates basic principles of judicial power. *Latrobe,* 545 F.2d at 1347. Dissolution of the *North Side* injunction meant that the Forest Service could enforce the contract without showing contempt for the court order, and enforce the February 15, 1984 deadline as well.

## II. ESTOPPEL ARGUMENT

■ Plaintiff argues that certain actions of defendant led it to justifiably rely on the deadline extension and that defendant is estopped from denying the extension. These events are: (1) the Deputy Chief's March 12, 1984 memo and the Contracting Officer's letter of March 21, 1984 indicating that the terms of the order would be followed; (2) the April 2, 1984 letter to Hoskins which states the Regional Forester's belief that MSEPs could be filed 30 days after dissolution of the injunction; (3) the Contracting Officer's requirement that Hoskins show a commitment to file a MSEP when it obtained the "interim modification" on April 10, 1984, nearly two months after the MSEP filing deadline of

February 15, 1984; (4) the October 29, 1984 conditional extension of the contract which was unilaterally granted to Hoskins and which extended the termination date to 30 days after the injunction; and (5) the settlement agreement proposal stating the government attorney's opinion that nonsettling class members might be permitted to file a MSEP, despite the Forest Service's contention that such MSEPs need not be accepted.

Hoskins contends that it would have performed the contract in 1984 had it known a MSEP extension would not be available. Hoskins purchased other timber, relying in part on the information and assurances which it received from various high-ranking Forest Service employees.

While plaintiff may have a case for estoppel in a normal commercial setting, the law controlling government contracts is unfavorable. The Supreme Court addressed the issue of estoppel against the government in *Office of Personnel Management v. Richmond*, 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990). Richmond, a former government employee, sought assurances from the Office of Personnel Management that the overtime work which he planned to perform would not prevent him from receiving disability pay. After working the overtime, his benefits were cut for six months because the oral and written information he received was incorrect. The Supreme Court held that the government was not estopped by the misinformation. *Richmond*, 110 S.Ct. at 2476.

The *Richmond* Court denied estoppel on the basis of Article I, § 9, cl. 7 of the Constitution which provides, "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." 110 S.Ct. at 2471. The Constitution prohibited payment to Richmond because Congress did not appropriate money to pay the benefits which he sought. The Court declined the opportunity to rule that estoppel never applies to the government: "Whether there are any extreme circumstances that might support estoppel in a case not involving payment from the Trea-

sury is a matter we need not address." *Richmond*, 110 S.Ct. at 2476.

In the context of a government contract dispute, the Federal Circuit found it "not entirely clear whether the defense of estoppel is still available against the government in light of the Supreme Court's decision in [*Richmond*]...." *Jana, Inc. v. United States*, 936 F.2d 1265, 1270 (Fed.Cir.1991). The Federal Circuit concluded that plaintiff had failed to establish the elements of estoppel, even if the defense still existed. *Jana*, 936 F.2d at 1270. Similarly, we need not decide the issue of whether the defense still exists, because plaintiff has failed to meet all of the elements of estoppel set forth in *Jana*.

The Agriculture Board of Contract Appeals also addressed the estoppel argument and concluded that the failure to file timely was due to appellant's conduct in causing the injunction to be issued, and not by any act on the part of the government. *Moore Mill & Lumber Co.*, 89–1 BCA (CCH) ¶ 21,-572 at 108,643.

Hoskins was given information which could have misled it concerning the right to file. However, if Hoskins did rely on government assertions, it took the risk that the employee with whom it communicated was acting without authority to bind the government. *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947) (government will not be bound by the actions of an employee who does not have proper authority). The Forest Service was not authorized to accept a MSEP submitted after February 15, 1984 because that was the deadline set out in the Federal Register. Hoskins was responsible for ascertaining the authority of the government employees with whom it dealt. *Prestex, Inc. v. United States*, 3 Cl.Ct. 373, 377 (1983), *aff'd without op.*, 746 F.2d 1489 (Fed.Cir.1984).

It may seem inconsistent that the Department of Justice could permit settling class members to file untimely MSEPs with the Forest Service while the Forest Service itself could not permit such filings. However, a distinction must be made between the power of the Department of Justice and

that of the Forest Service. Because the Department of Justice was handling the *North Side* litigation, it had the authority to allow the filing of untimely MSEPs as a part of its settlement authority, pursuant to 28 U.S.C. §§ 516 and 519 (1988). The Forest Service did not. *See generally United States v. Newport News Shipbuilding & Dry Dock Co.*, 571 F.2d 1283, 1287 (4th Cir.1978) (describing the Department of Justice's authority to settle cases), *cert. denied*, 439 U.S. 875, 99 S.Ct. 212, 58 L.Ed.2d 189 (1978).

## III.  CONTRACT MODIFICATION

█ Hoskins argues that the "interim modification" is an enforceable term of the contract. The Forest Service contends that the purpose of the "interim modification" was to allow the purchasers to extend or suspend their obligations while their proposed MSEP was pending. It was not intended to create an extension for the *filing* of a MSEP.

In interpreting the effect of a similar timber contract modification, the Agriculture Board of Contract Appeals concluded that "the contract modification conferred no rights on appellant other than temporarily preserving the status quo." *Moore Mill & Lumber Co.*, AGBCA # 87–172–1, 90–3 BCA (CCH) ¶ 23,111 at 116,033. Neither the Contracting Officer nor the Regional Forester had authority to grant an extension of the type which Hoskins maintains it received. The Code of Federal Regulations' guidelines for Timber Sale Contracts which were in effect at the time clarify the Forest Service employees' roles in the administration of timber sale contracts.

36 C.F.R. § 223.115 Contract extensions.

The term of any contract or permit shall not be extended unless the approving officer finds: (a) That the purchaser has diligently performed in accordance with contract provisions and an approved plan of operation;  or

(b) That the substantial overriding public interest justifies the extension.

The power to extend the contract was delegated to the approving officer or Contracting Officer. However, the section required that a contract not be extended absent a finding that the purchaser had diligently performed the contract or that there was a substantial overriding public interest. In the present suit there is no indication that the Contracting Officer made such findings.

The Code of Federal Regulations permits modification of these contracts and delegates some of that power to the Regional Foresters, but the modifications must be consistent with other regulations.[1] Thus, while the Contracting Officer and the Regional Forester had some authority to modify the contract, they did not have the power to modify the contract in the manner which Hoskins contends because the Contracting Officer failed to make the required findings.

The only extensions which the Contracting Officer or Regional Forester could have granted were pursuant to notices in the Federal Register regarding the "interim modifications" and "conditional extensions" in the Multi–Sale Extension Program.

## IV.  COMPLIANCE WITH THE ADMINISTRATIVE PROCEDURE ACT

█ Hoskins argues that the decision not to accept MSEPs from nonsettling *North Side* class members was either a substantive rule or an interpretive rule of general applicability, both of which must be published in the Federal Register pursuant to the Administrative Procedure Act, 5 U.S.C. § 552(a)(1)(B)–(D) (1988). The Act

---

1.  36 C.F.R. § 223.112 Modification of contracts.
     Timber sale contracts may be modified only when the modification will apply to unexecuted portions of the contract and will not be injurious to the United States. Modifications may be made by the officer approving the sale, by his successor, or by his superior, except as provided in § 223.110.

36 C.F.R. § 223.110 Delegation to regional forester.
  The Chief, Forest Service, after approval of conditions of sale, may authorize Regional Foresters formally to execute timber sale contracts and related papers in sales exceeding the volume which the Regional Forester has been authorized to sell.

prevents private parties from being subject to rules of which they do not have notice. *Bunge Corp. v. United States,* 5 Cl.Ct. 511, 523 (1984), *aff'd without op.,* 765 F.2d 162 (Fed.Cir.1985).

Substantive rules effect a change in existing law or policy. *Powderly v. Schweiker,* 704 F.2d 1092, 1098 (9th Cir.1983). Once the *North Side* court was found to be without jurisdiction, the Forest Service no longer had a duty to comply with the order. The Forest Service then followed the express terms of the Multi–Sale Extension Program with respect to the February 15, 1984 deadline. After the December 7, 1983 Federal Register notice, the requirements for filing a MSEP were not changed. There was no change in existing law or policy.

Interpretive rules, which merely clarify existing laws or regulations and have no significant impact upon any segment of the public, need not be published. *Anderson v. Butz,* 550 F.2d 459, 463 (9th Cir.1977) (citing *Lewis v. Weinberger,* 415 F.Supp. 652, 659 (D.N.M.1976)). A change from existing law, policy, or practice is deemed to have a significant impact. *Knutzen v. Eben Ezer Lutheran Housing Center,* 815 F.2d 1343, 1351 (10th Cir.1987). The regulation establishing the MSEP deadline was published in the Federal Register. Therefore, the decision not to accept Hoskins' late MSEP was an act of compliance with a regulation then in effect. It was not a change from existing law, policy, or practice. It was not an interpretive rule requiring publication.

## V. COLLATERAL ESTOPPEL

■ Plaintiff asks that defendant be collaterally estopped from denying that the MSEP filing deadline was extended to 30 days after dissolution of the *North Side* injunction because this legal issue was fully and fairly litigated in *Hampton Tree Farms, Inc. v. Yeutter,* 85–1085–BU (D.Or., March 19, 1990). The Supreme Court in *United States v. Mendoza,* 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984), prohibited the use of non-mutual *offensive* collateral estoppel against the

government. However, Hoskins asserts that it is entitled to use *defensive* collateral estoppel because it could be seen as a defendant on the government's counterclaim.

The Court has permitted the use of *mutual* collateral estoppel against the government. *United States v. Stauffer Chemical Co.,* 464 U.S. 165, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984). However, it stated that the reasons for the Court's "disapproval of collateral estoppel against the Government are for the most part inapplicable where mutuality is present...." *Mendoza,* 464 U.S. at 163–64, 104 S.Ct. at 574. Although the holding in *Mendoza* applied specifically to a case of non-mutual *offensive* collateral estoppel, the rationale for that holding indicates that non-mutual *defensive* estoppel should be precluded as well. *See Stauffer Chemical Co.,* 464 U.S. at 173, 104 S.Ct. at 580 (making no distinction between non-mutual offensive and defensive collateral estoppel).

## VI. FAILURE TO NOTIFY OF CONTRACT DEFAULT

■ Hoskins argues that the Forest Service may not collect damages because Forest Service employees did not give timely notice of the impending default pursuant to the Forest Service Manual § 2433.12: "Whenever possible ... notice [of default] should be given in sufficient time to allow the purchaser to complete the sale within the designated operating season." In 1982 and 1984, Hoskins was notified of impending deadlines for performance. No notice was given before termination on December 31, 1985.

The language of the manual regarding notice of default suggests that this is not a mandatory procedure. More importantly, courts have held that the Forest Service Manual "does not rise to the status of a regulation." *Hi–Ridge Lumber Co. v. United States,* 443 F.2d 452, 455 (9th Cir. 1971). The manual does not have the force and effect of law. *Lumber, Production and Industrial Workers Log Scalers Local 2058 v. United States,* 580 F.Supp. 279, 284 (D.Or.1984).

The manual is a general guide which is intended primarily for use by Forest Service employees. The manual was not published in the Federal Register or codified in the Code of Federal Regulations. *See* Administrative Procedure Act, 5 U.S.C. § 552 (1988).

Hoskins did receive notice of the Forest Service's position with respect to MSEP filings when it was offered the opportunity to settle the *North Side* law suit in October 1985. The letter stated the Forest Service contention that it did not have to accept MSEPs from class members, "except from those who choose to accept and sign the settlement agreement." While this was not an explicit notice of termination, it clearly indicated the position of the Forest Service that only those who settled could file for a MSEP extension under the Multi-Sale Extension Program.

## VII. DAMAGES

█ Hoskins argues that even if it is precluded from filing a MSEP and receiving an extension, the government has not been damaged. The damages were assessed pursuant to Clause B9.4 of the contract which states in relevant part:

B9.4 Failure to Cut. In event of ... Purchaser's failure to cut designated timber on portions of Sale Area by Termination date, Forest Service shall appraise remaining Included Timber....

... *If there is no resale,* damages due shall be determined by subtracting the value established by said appraisal from the difference between Current Contract Value and Effective Purchaser Credit. (emphasis supplied)

"It is well settled that a party to a contract will be bound by the terms ... unless the contract is found to be unreasonable ... or it produces an egregious, unfair or unreasonable result." *Forest Environmental Servs. Co. v. United States,* 5 Cl. Ct. 774, 777 (1984). In permitting the use of Clause B9.4 the court in *Forest Environmental* noted that the clause was adopted as a "result of careful analysis by the Forest Service with input from the timber industry." 5 Cl.Ct. at 778 n. 15. In

that case, however, the Forest Service had resold the timber contract in question. Other courts have approved the use of Clause B9.4 as a measure of damages. *Siller Bros., Inc. v. United States,* 655 F.2d 1039, 228 Ct.Cl. 76 (1981), *cert. denied,* 456 U.S. 925, 102 S.Ct. 1970, 72 L.Ed.2d 440 (1982); *Engle Investors v. United States,* 18 Cl.Ct. 734 (1989); *Columbia Helicopters, Inc.,* AGBCA # 85–295–1, 87–3 BCA (CCH) ¶ 20,087 at 101,691.

In *Columbia Helicopters* the Forest Service could not resell a timber contract under the original conditions. The Board of Contract Appeals held that this did not matter because B9.4 "also establishes a method of computing damages when there is no resale." *Columbia Helicopters,* 87–3 BCA (CCH) ¶ 20,087 at 101,693.

The Court of Claims has held that the government could not collect damages when the lumber was not resold or there was no intention to resell. *Louisiana–Pacific Corp. v. United States,* 227 Ct.Cl. 756 (1981). In that case, the government alleged that the contractor failed to cut any of the timber required by the contract. The government offered to settle the matter, but the contractor declined the offer. The offer allowed the contractor the opportunity to cut only one-fifth of the required trees with the government assessing damages for the remaining uncut trees which the government had no intention of cutting after the contractor's default.

The court found that in such a situation "the Government would not be injured or damaged by the non-cutting, and does not deserve any monetary compensation for the failure to cut." *Louisiana–Pacific,* 227 Ct.Cl. at 758. Thus, the court prevented the government from recovering damages on that portion of the timber contract which was never sold and which the government had no plan to sell at the end of plaintiff's unextended term or for any reasonable time thereafter. 227 Ct.Cl. at 758 (the damages clause may have been different from the one at issue in this case). According to *Louisiana–Pacific* the court may not award damages if the government has no intention of reselling the timber.

A court should not attempt to determine damages when the parties have agreed upon a measure in the contract. Hoskins has not argued that it did not freely enter into the contract. The court in *Forest Environmental* stated "Clause B9.4 provides an adequate measure of damages where damages would otherwise be difficult to measure, and we hesitate to supplant our judgment for that of the agency in matters where we have no developed expertise." 5 Cl.Ct. at 778.

The measure of damages set out in Clause B9.4 may be appropriate regardless of whether the lumber was to be resold. The measure of damages is approximately equivalent to the difference between the contract price of the uncut timber and its market value at the time of breach. "The section B9.4 damages provisions are, in substance, similar to common law breach of contract damage computations and have received judicial approval as a reasonable damage response to default of a timber sale contract." *Engle Investors*, 18 Cl.Ct. at 741 n. 11.

This contract/market differential measure of damages may lead to a partial double recovery in this case, because defendant could have both the money from the contract and the value of the standing timber as protection for the Spotted Owl. A party should not be permitted to recover duplicate damages. *California Canners & Growers Ass'n v. United States*, 7 Cl.Ct. 69, 94 (1984). Nonetheless, this measure of damages is included in the Uniform Commercial Code. U.C.C. § 2–708. The wide use of this measure of damages shows that courts and legislatures around the country find it to be reasonable.

Defendant urges us to consider the *Louisiana–Pacific* decision to be interlocutory and therefore not a binding precedent. It is true that this was a remand to the Trial Division for further development of several complex legal and factual issues. However, it was a decision on the merits at least on the issue which concerns us directly—should defendant receive damages for failure to cut timber which it has no intention of selling.

The *Louisiana–Pacific* court held:

*The one issue we do decide* at this time relates to the amount of uncut timber for which the defendant should be permitted to claim damages.... [The contract] should not be read to call for recovery of damages from plaintiff for uncut timber which the Government has no intention of selling but wishes to preserve indefinitely. In that situation the Government would not be injured or damaged by the non-cutting, and does not deserve any monetary compensation for the failure to cut.

*Louisiana–Pacific*, 227 Ct.Cl. at 758 (emphasis supplied). This is a clear direction from the Court of Claims. If it is not binding precedent certainly it is persuasive. The policies on the other side are the parties' right to contract for a reasonable means of determining damages in the event of breach, and the fact that the method is generally accepted by most states through Article 2 of the Uniform Commercial Code.

If defendant recovers both the money it would have received under the contract and the value of the standing timber as a haven for the Spotted Owl, the question of double recovery must be considered. The law does not favor penalties or forfeitures.

## CONCLUSION

1. Defendant's motion for summary judgment as to liability is GRANTED; plaintiff's motion for summary judgment is DENIED;

2. The parties will discuss the possibility of settling this case for reasonable damages, considered in light of this Opinion;

3. The parties will file a status report on or before October 15, 1991, to advise the court whether the damage issue has been resolved;

4. In absence of settlement, the court will hear arguments on defendant's counterclaim, and testimony if appropriate, on Tuesday, November 12, 1991 at 10 o'clock a.m., in the National Courts Building,

Washington, D.C., in a courtroom to be posted in the lobby on that day.