UNITED STATES of America, et al., Plaintiffs,

v.

ALASKA PUBLIC UTILITIES COMMISSION, et al., Defendants.

No. A91–351 Civ.

United States District Court, D. Alaska.

June 5, 1992.

858

Susan Lindquist, Asst. U.S. Atty., Anchorage, Alaska and Peter Q. Nyce, Jr., Gen. Atty., Regulatory Law Office, Arlington, Va., for plaintiffs.

Elizabeth J. Hickerson, Asst. Atty. Gen., Anchorage, Alaska, for defendants.

## ORDER

HOLLAND, Chief Judge.

### MOTION TO DISMISS; CROSS-MOTIONS FOR SUMMARY JUDGMENT

#### I.

*Background*

The facts in this case are not in dispute. In 1985 and 1987, the Alaska Public Utilities Commission (APUC) held hearings regarding rate increases proposed by ALASCOM.

The United States General Services Administration (GSA) has the discretion to intervene in a rate setting hearing when it determines that to do so would be in the taxpayers' best interests.[1] GSA can in turn delegate the authority to intervene to another governmental entity.[2] The Department of Defense (DoD) maintains military installations in Alaska within ALASCOM's service area, and GSA instructed the DoD to intervene. The DoD therefore intervened in the 1985 and 1987 hearings to

---

**1.** 40 U.S.C. § 481(a)(4) reads:

The Administrator [of GSA] shall, in respect of executive agencies, and to the extent that he determines that so doing is advantageous to the Government in terms of economy, efficiency, or service, and with due regard to the program activities of the agencies concerned—

. . . .

(4) with respect to transportation and other public utility services for the use of executive agencies, represent such agencies in negotiations with carriers and other public utilities and in proceedings involving carriers or other public utilities before Federal and State regulatory bodies[.]

**2.** 40 U.S.C. § 486(d) reads:

The Administrator [of GSA] is authorized to delegate and to authorize successive redelegation of any authority transferred to or vested in him by this Act (except for the authority to issue regulations on matters of policy having application to executive agencies, the authority contained in section 754 of this title, and except as otherwise provided in this Act) to any official in the General Services Administration or to the head of any other Federal Agency.

*See also* Exhibit G attached to the DoD's motion for summary judgment (Clerk's Docket No. 14).

protect its rights as a consumer of ALAS-COM's services.[3]

The APUC has the duty to apportion the costs associated with rate setting hearings among the participants.[4] In its petitions to intervene in the hearings, the DoD stated:

> The Military acknowledges the authority of the Commission to allocate costs of an investigation or hearing among the parties (Alaska Stat. § 42.05.651). Petitioner is willing to accept this potential liability and pay its share of the expenses in this case.

Exhibit A to the DoD's motion for summary judgment (Clerk's Docket No. 14).

The total costs assignable to the 1985 hearing were $486,089.45, and those of the 1987 hearing were $311,250.81. The DoD was assessed 2.5% of the costs for each hearing, which amounts to $12,152.24 and $7,781.30, respectively. The DoD's total liability for the costs of these hearings was therefore $19,933.54.[5]

The DoD opposed payment of these costs on the grounds that they were unreasonable and that its liability should be drastically reduced.[6] In its opposition to the assessment, the DoD quoted an unpublished decision by the Comptroller General entitled "Payment of Costs by the United States for Intervening in Proceedings of Alaska Public Utilities Commission"[7] which concluded that under identical circumstances the DoD would be liable for a $260 cost assessment. The DoD asserted

that under this decision, it should only be liable, if at all, for a very small assessment. By order dated June 26, 1991, the APUC refused to reduce the DoD's share of the 1985 and 1987 hearings. However, the APUC agreed with that part of the Comptroller General's decision that concluded that the DoD voluntarily intervened in the proceeding and had thereby accepted the responsibility to pay the costs allocated to it. The APUC stated:

> [T]he allocation of costs in this proceeding does not restrict DOD's ability to participate fully in the Commission's proceedings. The allocation of costs simply requires DOD to pay its fair share of costs. Just as DOD must evaluate whether it has sufficient resources to pay for consultants, attorneys, and travel expenses before intervening in a proceeding of the Commission, it must similarly consider whether it has sufficient resources to pay a fair allocation of costs.

Exhibit F (at 4) to the DoD's motion for summary judgment (Clerk's Docket No. 14).

The DoD then filed a complaint which requests this court to declare AS 42.05.651 (which requires the APUC to allocate the costs of a utility hearing among the parties) in violation of the Supremacy Clause, Article VI, Clause 2, and therefore unconstitutional as applied to the DoD. The complaint also alleges that AS 42.05.651 conflicts with the DoD's obligations under

---

**3.** Exhibit A attached to the DoD's motion for summary judgment (Clerk's Docket No. 14).

**4.** AS 42.05.651 reads:

(a) After completion of a hearing or investigation held under this chapter, the commission shall allocate the costs of the hearing or investigation among the parties, including the commission, as is just under the circumstances. In allocating costs, the commission may consider the results, ability to pay, evidence of good faith, other relevant factors and mitigating circumstances. The costs allocated may include the costs of any time devoted to the investigation or hearing by hired consultants, whether or not the consultants appear as witnesses or participants. The costs allocated may also include any out-of-pocket expenses incurred by the commission in the particular proceeding. The commission shall provide

an opportunity for any person objecting to an allocation to be heard before the allocation becomes final.

(b) The commissioner of administration shall separately account for investigation and hearing costs collected under this section that the commission deposits in the general fund. The annual estimated balance in the account may be used by the legislature to make appropriations to the commission to carry out the purposes of this section.

**5.** *See* Exhibits B and C to the DoD's motion for summary judgment (Clerk's Docket No. 14).

**6.** Exhibits D and E to the DoD's motion for summary judgment (Clerk's Docket No. 14).

**7.** Op. Comp. Gen. B–190630 (Apr. 14, 1978), attached as Exhibit D to the DoD's motion for summary judgment, at 19–22.

the Anti–Deficiency Act, 31 U.S.C. § 1341(a) and is thereby unconstitutional as applied to the DoD.[8]

The APUC has filed a motion to dismiss the complaint. The DoD filed a motion for summary judgment, and the APUC filed a cross-motion. All motions are ripe and neither party has requested oral argument.

## II.

### APUC's Motion to Dismiss

The APUC contends that the complaint should be dismissed on two separate theories: first, that under *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), and *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424, *reh'g denied* 320 U.S. 214, 63 S.Ct. 1442, 87 L.Ed. 1851, and *reh'g denied* 320 U.S. 214, 63 S.Ct. 1442, 87 L.Ed. 1851 (1943), this court should abstain from exercising jurisdiction; and, second, that the government is estopped from requesting relief because it specifically agreed to pay the costs involved in the hearings.

### A.

### Abstention

■ The *Pullman* case stands for the proposition that a federal court should abstain from ruling on a broad constitutional issue when the underlying dispute can be resolved by a decision on a narrow state law issue. In *Pullman* an agency within the Texas state government issued a regulation that arguably violated the Equal Protection Clause of the United States Constitution. However, the Supreme Court ruled that the district court should abstain from exercising jurisdiction because the state agency might have exceeded its statutory authority when it promulgated the regulation. Since a state court might have been able to resolve the dispute without reaching a sensitive constitutional issue, jurisdiction should not be exercised by the federal court.

■ This rule does not apply to the case at bar. The issue of whether the federal government can be made to pay its share of the costs associated with the rate setting hearing cannot be resolved on some narrow issue in a state tribunal. Although the Alaska statutes provide a mechanism for the resolution of disputes over the costs associated with rate setting hearings in Alaska's courts,[9] the legal challenges raised by the federal government would be the same in both the state and federal courts. Jurisdiction is proper in this court since the United States is a party, 28 U.S.C. § 1345, and *Pullman* does not compel this court to abstain from exercising that jurisdiction.

The APUC also relies on *Burford.* At the time of the *Burford* case, thousands of entrepreneurs had drilled wells in a relatively small area of land in east Texas. The difficulties associated with the competing claims to land and underground mineral rights were exceedingly complex, and in response the Texas government devised a specialized system to resolve these disputes. The plaintiff in *Burford* was an oil company that attacked the validity of an order of the Texas Railroad Commission granting a person a permit to drill a number of wells. The plaintiff filed suit in federal court; and the Supreme Court held that in order to maintain the predictability and consistency of results, all of the claims subject to Texas' specialized dispute resolution process should be brought within the state forum. The Court felt that involvement of the federal courts in those disputes would only confuse the issues, and that abstention by the federal courts was warranted.

*Burford* does not require this court to abstain from accepting jurisdiction in this case. The federal government has challenged the validity of certain Alaska statutes as applied to it, and the state courts do not provide a specialized process for resolving this dispute.

Furthermore, in *United States v. Public Service Commission of Maryland,* 422

---

**8.** Clerk's Docket No. 1 at 5.

**9.** *See* AS 42.05.551; AS 44.62.560–.570.

F.Supp. 676, 678–9 (D.Md.1976) (hereinafter *"Public Service Commission"*), a three-judge district court panel reached the same conclusion under very similar circumstances. In that case, the United States was the plaintiff and jurisdiction was therefore partly based on 28 U.S.C. § 1345. The court stated:

> The problems of federalism inherent in this case are thus different from a case brought by a private litigant [as in *Pullman* ]. Except in some suits for money damages or for collection of moneys due, the United States sues to redress or to prevent alleged injury to a national interest; and to anticipate our view of the merits, such is this case. We think it unseemly to hold either that a sovereign may not enforce its rights in its own courts, or that in enacting § 1345 Congress was not stating a sufficiently strong policy that the United States should be heard in its own courts that the judicially created *Pullman* doctrine should be applied. Thus, the presence of the United States as a plaintiff and the nature of the suit militate strongly against the applicability of abstention.

*Public Service Commission*, 422 F.Supp. at 679. Abstention is clearly not warranted in this case.

## B.

### *Estoppel*

This is the crux of the APUC's case. As noted above, in both of its petitions to intervene, the government affirmatively stated that it would be willing to pay its share of the costs associated with the rate setting hearings. The APUC asserts that the government should be estopped from avoiding this voluntarily assumed obligation. The leading case on estoppel against the government in the Ninth Circuit is *Watkins v. United States Army*, 875 F.2d 699 (9th Cir.1989), *cert. denied*, —— U.S. ——, 111 S.Ct. 384, 112 L.Ed.2d 395 (1990). In that case, the Army frequently assured Watkins, an enlisted man, that his career was safe even though his professed homosexuality was grounds for dismissal under Army policy. When he was discharged for being a homosexual, after fourteen years of exemplary service, he filed suit claiming that the government should be estopped from discharging him on those grounds.

The Ninth Circuit held that although the government may not be estopped on the same terms as a private litigant, "where justice and fair play require it, estoppel will be applied against the government." *Watkins*, 875 F.2d at 706. The court stated that in addition to the traditional elements of estoppel,[10] the government will not be estopped unless the plaintiff can show that the government engaged in affirmative misconduct beyond mere negligence, and "the government's acts also threaten to work a serious injustice and the public's interest will not be unduly damaged by the imposition of estoppel." *Id.* at 707–8. The Ninth Circuit concluded that in regard to Watkins the government had engaged in a "pervasive pattern of false promises" and that estoppel was warranted under the unique facts of that case. *Id.* at 708–11.

However, in none of the cases that follow *Watkins* has the Ninth Circuit concluded that the government should be estopped.[11]

---

**10.** (1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.
*Watkins*, 875 F.2d at 709, *quoting United States v. Wharton*, 514 F.2d 406 (9th Cir.1975).

**11.** *See Bolt v. United States*, 944 F.2d 603, 609 (9th Cir.1991) (negligent oversight by government employee did not amount to affirmative misconduct); *United States v. Hatcher*, 922 F.2d 1402 (9th Cir.1991) (government failure to inform scholarship contestant of possible preferential treatment of other contestants was not affirmative misconduct); *United States v. Fowler*, 913 F.2d 1382 (9th Cir.1990) (since funds paid out of federal treasury must be authorized by Congress and funds claimed by plaintiff were not authorized under any statute, plaintiffs could not rely on estoppel theory to avoid reimbursing government for over $20,000 mistakenly paid by government agency); *S & M Investment Co., v. Tahoe Regional Planning Agency*, 911 F.2d 324 (9th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 963, 112 L.Ed.2d 1050 (1991) (oral misstatement by low level government

In addition, the United States Supreme Court recently reiterated its position that it has never upheld an assertion of estoppel against the government by a claimant seeking public funds. *Office of Personnel Management v. Richmond*, 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387, *reh'g denied*, —— U.S. ——, 111 S.Ct. 5, 111 L.Ed.2d 821 (1990). The precise holding of *Richmond* is that the Court will not uphold an estoppel claim against the government for money in violation of a statute. In that case, no statute authorized the disbursement of money requested by the plaintiff. The Court reasoned that only Congress can authorize payments from the public treasury and an unauthorized payment made by an agent of the executive branch would be a violation of the Appropriations Clause of the Constitution. *Id.* 496 U.S. at 423–25, 110 S.Ct. at 2471.

The Court left open the issue of whether an estoppel claim could ever succeed against the government. *Id.* However, it also noted that:

> [A]cceptance of estoppel claims for Government funds could have pernicious effects. It ignores reality to expect that the Government will be able to "secure perfect performance from its hundreds of thousands of employees scattered through out the continent." To open the door to estoppel claims would only invite endless litigation over both real and imagined claims of misinformation by disgruntled citizens, imposing an unpredictable drain on the public fisc. Even if most claims were rejected in the end, the burden of defending such estoppel claims would itself be substantial.

*Id.* 496 U.S. at 433, 110 S.Ct. at 2476 (citation omitted).[12] In light of the foregoing, the court concludes that the DoD's initial agreement to contribute to the costs of the rate setting hearing, and subsequent refusal to do so, does not amount to "affirmative misconduct". The government is not estopped on the facts of this case. The APUC's motion to dismiss the DoD's complaint is denied.

### III.

*The Motions for Summary Judgment*

In its motion for summary judgement, the DoD makes three main arguments: first, that a state's imposition of costs on the federal government violates the Supremacy Clause; second, that the imposition of costs in this case violates the Anti-Deficiency Act, 31 U.S.C. § 1341; and third, that the government is not estopped under these facts. The APUC's motion for summary judgment proceeds on four fronts: first, that the Supremacy Clause is not violated; second, that the Anti-Deficiency Act is not violated; third, that the government is estopped; and fourth, that under the Johnson Act, 28 U.S.C. § 1342, this court lacks jurisdiction. The estoppel arguments have been disposed of above. Since the APUC's reliance on the Johnson Act raises a jurisdictional question, it will be addressed first.

### A.

*The Johnson Act*

■ The relevant portion of the Johnson Act reads as follows:

*Rate orders of State agencies*

The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where:

(1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,

---

12. *See also S & M Investment:* "In dealing with the government, an individual is charged with knowing government statutes and regulations and assumes the risk 'that government agents may exceed their authority and provide misinformation.'" 911 F.2d at 329, *quoting Lavin v. Marsh,* 644 F.2d 1378, 1383 (9th Cir.1981).

agent did not amount to affirmative misconduct); *Seldovia Native Association Inc. v. Lujan,* 904 F.2d 1335 (9th Cir.1990) (change in interpretive ruling by government agency that misled plaintiffs did not amount to affirmative misconduct).

(2) The order does not interfere with interstate commerce; and,

(3) The order has been made after reasonable notice and hearing; and,

(4) A plain, speedy and efficient remedy may be had in the court of such State. 28 U.S.C. § 1342. This statute proscribes federal court injunctions of orders affecting public utility *rates. See Public Service Commission,* 422 F.Supp. at 677–8. The challenged order in this case relates to the costs attributable to a rate setting hearing, and thus does not fall within the Johnson Act proscription. In addition, jurisdiction in this case is not based solely on diversity or repugnance to the United States Constitution. Jurisdiction is predicated on 28 U.S.C. § 1345, providing federal court jurisdiction where the United States is a party. The Johnson Act is not applicable.[13]

### B.

### *The Supremacy Clause* [14]

■ It has long been understood that the Supremacy Clause implies that, absent Congressional consent, states may not tax or control a federal instrumentality. *M'Culloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 41 L.Ed. 579 (1819). This decision is based on the principle that a government may not tax or control those whom it does not represent.[15]

In *Mayo v. United States,* 319 U.S. 441, 63 S.Ct. 1137, 87 L.Ed. 1504 (1943), *reh'g denied,* 320 U.S. 810, 64 S.Ct. 27, 88 L.Ed. 489 (1943), the Supreme Court held that this prohibition extends to fees imposed by the states on the federal government. The Florida legislature had passed a law which required all sellers of fertilizer to pay an inspection fee. Unless each bag of fertilizer was inspected and the fee paid, the bags could be seized and sold by the sheriff. The purpose of the legislation was to en-

sure the quality of the fertilizers sold to consumers. As part of a federal soil conservation program, the Secretary of Agriculture was empowered to purchase and distribute fertilizer. The United States distributed fertilizer to farmers in Florida without paying the fees or submitting to inspections. The Florida Commission of Agriculture issued a "stop sale" notice and the United States obtained an injunction against enforcement of the state law. In upholding this injunction, the Supreme Court noted that the state law authorizing seizure and sale by the sheriff of uninspected fertilizer could jeopardize administration of a federal program. The Court said:

These inspection fees are laid directly upon the United States. They are money exactions the payment of which, if they are enforceable, would be required before executing a function of government. Such a requirement is prohibited by the supremacy clause.

*Mayo,* 319 U.S. at 447, 63 S.Ct. at 1140. The DoD argues that under this reasoning, the APUC's exaction of costs against the DoD violates the Supremacy Clause.

In *United States v. State of Montana,* 699 F.Supp. 835 (D.Mont.1988), the United States intended to begin construction of buildings on an Air Force base in Montana. The State of Montana asserted that the United States was subject to the State's building permit and fee requirements. The court held, relying on *M'Culloch, Mayo,* and *James v. Dravo Contracting Co.,* 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155 (1937), that the fee requirements were invalid as against the United States. The court stated:

[T]he fees are, in effect, applied directly against the property of the United States and must be satisfied before work can

---

**13.** *See United States v. Public Service Commission of Maryland,* 422 F.Supp. 676 (D.Md.1976), and cases cited therein.

**14.** The Supremacy Clause reads:
This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United

States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any States to the Contrary notwithstanding.
Article VI, Cl. 2.

**15.** Tribe, *American Constitutional Law,* § 6–30 at 512 (2d ed. 1988).

proceed. Consequently, the fees place a direct burden upon the United States in the execution of its governmental functions in violation of the supremacy clause.

*Montana,* 699 F.Supp. at 839.

The APUC does not cite any case with a contrary holding, and its attempt to distinguish *Mayo* and *Montana* is limited to one sentence in which it states that reliance on those cases is misplaced because this case does not involve a state fee or tax imposed on the federal government or its property.

The APUC argues that intervention by the federal government in a state utility proceeding is not mandatory under 40 U.S.C. § 481. The GSA administrator is given discretion to determine whether it is in the best interest of the United States to intervene. The APUC states that it is reasonable to assume that, prior to making the decision to intervene, the GSA determined that the costs the federal government would incur in its participation were within the agency's budget, and therefore an authorized expenditure. To act otherwise would be an unreasonable exercise of discretion under 40 U.S.C. § 481.

The APUC also relies on the decision of the Comptroller General, cited above, where we read:

> [N]o issue of sovereign immunity or of federal supremacy is present. This is not a situation where an attempt at state regulation interferes with the performance of a federal function. Having chosen to participate in the state's rate-setting procedure and hence having accepted the conditions of financial responsibility attaching to that participation, the United States should not now be heard to argue that those conditions interfere with its supremacy.

Op.Comp.Gen. B–190630 (Apr. 14, 1978), attached as Exhibit D to the DoD's motion for summary judgment, at 22. It appears that the Comptroller General's decision was based primarily on an estoppel theory, which, as discussed above, is inappropriate. The DoD also disagrees with the conclusion that the imposition of costs does not interfere with the performance of a federal

function. It argues that since the APUC has the authority to grant or deny intervention, it is conceivable that in the future DoD would be denied access to the hearing if it continues to refuse to pay costs. This, DoD argues, would constitute a burden on a federal function.

In *Montana,* the court concluded that the fees were a burden on the federal government because they had to be satisfied before work could proceed. Here, of course, the costs are not tallied and imposed until after they have been incurred, but the government must agree to pay these costs before it is allowed to intervene in the hearings. The court perceives no meaningful distinction between these costs and the building fees in *Montana* or the inspection fees in *Mayo.* In each case the government acted voluntarily but would not be allowed to complete its act until it paid, or agreed to pay, a sum of money to a state agency. The court concludes that the imposition of costs against the federal government pursuant to AS 42.05.651 is invalid under the Supremacy Clause.

## C.

### *The Anti–Deficiency Act*

In light of the court's disposition of the Supremacy Clause issue, the court need not reach the question of whether the imposition of costs in the hearings by defendant is prohibited by the Anti–Deficiency Act. 31 U.S.C. § 1341.

## IV.

### *Conclusion*

On the basis of the foregoing authorities, the court concludes that the APUC's motion to dismiss and its cross-motion for summary judgment must be denied, and that the plaintiff's motion for summary judgment must be granted.

The clerk of court shall enter judgment as follows:

> The application of AS 42.05.651 as against the federal government is an unconstitutional exercise of state powers

because such application violates the Supremacy Clause.

———

The court feels compelled to offer an additional editorial comment on this situation. The matter which brings the parties before this court calls out for an appropriately high level executive decision on the part of the State of Alaska and the federal government. It takes no great wit to perceive that this ruling might precipitate ill feeling between the APUC and the GSA, DoD, or other federal agencies who are affected by public utility rates in the State of Alaska. It would not be surprising if the APUC were to decline future applications by government agencies to intervene in its rate-making proceedings. This would indeed be unfortunate because of the high level of federal government activity in the state of Alaska. Federal agencies should participate in decision making which affects them, and this court does not relish the prospect of being asked whether it has the power to require the APUC to permit federal agencies to participate in APUC proceedings without contribution for the costs of such proceedings.

The parties would be well advised to inquire whether or not there is a need for comity here. If, for example, the Federal Energy Regulatory Commission taxes costs to parties such as the State of Alaska which appear before it, then the parties should look for a way to accommodate the APUC in matters such as this. Conversely, if federal agencies do not routinely allocate costs to parties including the state or its agencies, then perhaps comity would suggest that the State of Alaska should similarly treat federal agencies. In any event, the parties should approach this problem at an appropriate executive level and resolve the matter in a fashion that will not trigger the hard rules which dictate the decision in this case.