# United States Marshals Service Obligation to Take Steps to Avoid Anticipated Appropriations Deficiency

Under the apportionment provisions of the Antideficiency Act, the United States Marshals Service has an affirmative obligation to take steps to avoid a deficiency in its Federal Prisoner Detention budget and any drastic curtailment of its prisoner detention services by reducing current expenditures and/or exploring alternative sources of funding that would not depend upon the receipt of additional funds from Congress.

May 11, 1999

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
UNITED STATES MARSHALS SERVICE

This memorandum provides an initial response to your request that this Office provide the United States Marshals Service ("USMS") with legal advice concerning its obligations under the Antideficiency Act, 31 U.S.C. §§ 1341–1342, 1349–1350, 1511–1519 (1994) ("ADA"), which provides, in relevant part, that

> [a]n officer or employee of the United States Government or of the District of Columbia government may not — (A) make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation; [or] (B) involve either government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law.

*Id.* § 1341. Exceptions to the ADA permit expenditures or obligations in excess of an appropriation where "authorized by law" or necessary to address "emergencies involving the safety of human life or the protection of property." *Id.* §§ 1341, 1342. Although we have previously considered these exceptions in the context of actual or anticipated lapses in agency appropriations or authorization,[1] your request asks us to analyze whether, in the event of a deficiency in the USMS FY1999 "Federal Prisoner Detention" ("FPD") appropriated budget that is unrelated to a lapse in appropriations, the USMS could successfully invoke one of the exceptions to the ADA or assert some other grounds for exemption from that statute and the administrative and criminal penalties imposed for noncompliance with its mandate. *See* 31 U.S.C. § 1349 (subjecting ADA violators to "appropriate

---

[1] *See, e g., Effect of Appropriations for Other Agencies and Branches on the Authority to Continue Department of Justice Functions During the Lapse in the Department's Appropriations,* 19 Op. O L C 337 (1995), *Maintaining Essential Services in the District of Columbia in the Event Appropriations Cease,* 12 Op O L C. 290 (1988); *Continuation of Agency Activities During a Lapse in Both Authorization and Appropriation,* 6 Op. O.L C. 555 (1982); *Payment of Travel Costs to Witnesses During a Period of Lapsed Appropriations,* 5 Op O L C. 429 (1981), *Applicability of the Antideficiency Act Upon a Lapse in an Agency's Appropriation,* 4A Op. O.L.C. 16 (1980)

administrative discipline including, when circumstances warrant, suspension from duty without pay or removal from office"); *id.* § 1350 (imposing a criminal fine of not more than $5,000 and/or a term of imprisonment for not more than two years); *see also Office of Personnel Management v. Richmond,* 496 U.S. 414, 430 (1990) (explaining that "[i]t is a federal crime . . . for any Government officer or employee to knowingly spend money in excess of that appropriated by Congress"). We expect to provide a final legal opinion on these matters in the near future, but thought it important, in the interim, to advise you of USMS's affirmative obligation under the apportionment provisions of the ADA, *see* 31 U.S.C. §§ 1511–1519, to take steps to avoid a deficiency and any drastic curtailment of its prisoner detention services by reducing current expenditures and/or exploring alternative sources of funding that would not depend upon the receipt of additional funds from Congress. Maintaining current levels of USMS spending without additional funds, in an effort to force or even in anticipation of a supplemental congressional appropriation, would, in our view, be inconsistent with the purpose of the ADA.

Section 1512 of the ADA requires agencies to minimize the potential for engaging in expenditures that exceed congressional appropriations by apportioning their funds. It provides, in relevant part, that

> [e]xcept as provided in this subchapter, an appropriation available for obligation for a definite period shall be apportioned to prevent obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation for the period. An appropriation for an indefinite period and authority to make obligations by contact before appropriations shall be apportioned to achieve the most effective and economical use. An apportionment may be reapportioned under this section.

31 U.S.C. § 1512. Though the text of this provision refers only to an agency's obligation to apportion its appropriation to avoid an unauthorized expenditure or obligation of funds, we are persuaded that its legislative history — along with that of the ADA as a whole — evinces a general intent on the part of Congress to curb levels of agency spending "that would indicate a necessity for a deficiency or supplemental appropriation." [2]

---

[2] Section 1515 of the Act exempts agencies from § 1512's apportionment requirements where expenditures in excess of an appropriation are required by law or are necessary to avert an "emergency involving the safety of human life, the protection of property, or the immediate welfare of individuals." 31 U.S.C. § 1512(b)(1)(B). Whether the USMS could take advantage of such exemptions, however, is a matter that we do not address in this interim opinion. Because the § 1515 exemptions appear to have been patterned after other Antideficiency Act provisions, resolution of this question will have to await the completion of our research on the Act It should be noted, however, that an exemption from the requirements of § 1512 would very likely not be enough to exempt an agency from § 1341's mandate. *See* General Accounting Office, 2 *Principles of Federal Appropriations Law* 6–82 to 6–83 (1992) (discussing September 1, 1976 Comptroller General opinion explaining that "[a]ny deficiency that an agency incurs where obligations exceed total amounts appropriated, including a deficiency that arises in a situation where it was

The ADA enforces and extends the prohibition, set forth in Article 1, Section 9 of the Constitution, that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." While the earliest version of that statute, adopted in 1870, merely restated this constitutional principle, *see* Rev. Stat. 3679; 16 Stat. 230, 251 (1870); *see also* Cong. Globe, 41st Cong., 2d Sess. 1553 (1870), subsequent versions specifically targeted agency practices that had historically resulted in an overexpenditure or overobligation of government funds.[3] For example, the 1905 amendment to the ADA, inter alia, both prohibited agencies from making expenditures or obligations in excess of appropriations made by Congress unless "authorized by law" and added a requirement that agency appropriations be apportioned to minimize excessive expenditures in one period of the fiscal year that might result in a deficiency or require a supplemental appropriation at a later time.[4] The apportionment provision read as follows:

> All appropriations made for contingent expenses or other general purposes, except appropriations made for the fulfillment of contract obligations expressly authorized by law, or for objects required or authorized by law without reference to the amounts annually appropriated therefor, shall, on or before the beginning of each fiscal year, be so apportioned by monthly or other allotments as to prevent undue expenditures in one portion of the year that may require deficiency or additional appropriations to complete the service of the fiscal year . . . .

Act of Mar. 3, 1905, ch. 1484, § 4, 33 Stat. at 1257–58.

The relatively sparse legislative history of the 1905 amendment suggests that Congress was motivated by a very specific desire to eliminate the instances in which high levels of agency spending would require it to make additional funds available to cover a deficiency or to satisfy a request for a supplemental appropria-

---

determined that one of the exceptions set forth in [section 1515(b)] was applicable, would constitute a violation of 31 U.S.C. § [1341(a)]") This said, it should be emphasized that we have not yet reached a conclusion on the question whether any of the projected USMS expenditures in excess of appropriations could be justified under the "authorized by law" or "emergencies involving the safety of human life or the protection of property" exceptions to § 1341, or any other exemptions from that statute's mandate. That issue will be addressed in a subsequent opinion Our objective in this opinion is merely to advise you of your general obligation to avoid anticipated deficiencies by reducing spending and/or obtaining funds from sources that would not make supplemental funding from Congress necessary

[3] *See, e g.,* The ADA has been amended a number of times since its enactment in 1870. *See* Act of Mar. 3, 1905, ch. 1484, § 4, 33 Stat. 1214, 1257; Act of Feb. 27, 1906, ch 510, § 3, 34 Stat 27, 48; Act of Aug 23, 1912, ch 350, § 6, 37 Stat 360, 414, Act of Sept 6, 1950, ch 896, § 1211, 64 Stat 595, 765, Act of Aug. 1, 1956, ch. 814, § 3, 70 Stat 782, 783; Pub L. No. 85–170, § 1401, 71 Stat 426, 440 (1957); Pub. L No 93–344, § 1002, 88 Stat 297, 332 (1974), Pub. L. No. 93–618, § 175(a), 88 Stat. 1978, 2011 (1975), Pub. L. No. 101–508, § 13213(a), 104 Stat 1388, 1388–621 (1990)

[4] The 1905 statute also amended the 1870 version of the statute in three additional respects. It made it unlawful for any agency or government official to "accept voluntary service for the Government or employ personal service in excess of that authorized by law, except in cases of sudden emergency involving the loss of human life or the destruction of property," inserted a provision allowing certain limited waivers to the statutory prohibitions, and added a penalty provision. 33 Stat. at 1257–58.

tion. In describing the contents of the 1905 amendment to the Committee of the Whole House on the State of the Union, Representative Hemenway, explained:

> Mr. Chairman, I call attention to this particular limitation because we seek by it to prevent deficiencies in the future. It is a hard matter to deal with. We give to Departments what we think is ample, but they come back with a deficiency. Under the law they can make these deficiencies, and Congress can refuse to allow them; but after they are made it is very hard to refuse to allow them. So we seek by this amendment to in some respect, at least, cure that abuse.

39 Cong. Rec. 3687 (1905).

The legislative histories of other amendments placing constraints on the spending practices of government agencies and officials provide additional support for the view that the ADA was intended to curb agency actions that put Congress in the position of having to cover debts and make appropriations it either had not authorized or had not initially believed necessary to carry out the functions of the government. In 1906, lawmakers described amendments to that statute as Congress's attempt "to take back control of appropriations into its own hands." *See* 40 Cong. Rec. 1274 (1906) (statement by Representative Littauer). Statements to similar effect were made by legislators in 1950. In providing a section-by-section analysis of the 1950 amendment to the ADA, *see* Act of Sept. 6, 1950, ch. 896, § 1211, 64 Stat. 595, 765, Representative Norrell explained that the provisions pertaining to apportionment, in particular, were "designed to insure that appropriations which are available for a fiscal year . . . will not be obligated at a rate which would exhaust the appropriation prior to the end of the period for which the appropriation was made and thus result in a need for a deficiency or supplemental appropriation, or an increase in the authorization for administrative expenses of a corporation, or in drastic curtailment of the activity for which the appropriation or authorization was made." 96 Cong. Rec. 6835–36 (1950).[5]

---

[5] Two reports prepared by Congress prior to the 1951 revision of the ADA provide further support for the view that government agencies have an obligation under that statute to explore methods for reducing spending levels or reprogramming funds whenever an appropriation deficiency is anticipated, as well as when its existence has been established. *See* 36 Comp Gen. 699 (1957). The first report, prepared in 1945, addresses the recurring problem of deficiency spending and communicates the general interest on the part of lawmakers in limiting agency spending practices that result in the need for supplemental appropriations·

> The committee met with instances which indicated either a lack of knowledge or an utter disregard of the so-called antideficiency law (31 U.S.C 665), in that agencies reported overobligations during the first half of the current fiscal year to an extent which places the Congress in the position either of granting additional funds or forcing the curtailment of operations which in some cases would be unwise and harmful That sort of practice cannot be continued, particularly when the Congress is in continuous session. It must be stopped

Given this history, we are persuaded that an agency subject to the requirements of the Antideficiency Act may not properly continue high levels of spending in the face of an anticipated appropriations deficiency. Such spending would arguably violate the purpose of that statute, even where a strong case could be made for a statutory exemption were the existence of an actual deficiency ever proven.[6] Accordingly, we conclude that the USMS has an affirmative obligation either to obtain additional funds from sources that would not require additional funds from Congress or immediately curtail detention-related expenditures and obligations that would eventually require a deficiency or supplemental appropriation. This conclusion is consistent with opinions previously rendered by the Comptroller General and the General Accounting Office. *See* 64 Comp. Gen. 728, 735 (1985) (holding that ICC decision to furlough its employees to reduce costs was consistent with that agency's obligation under the Antideficiency Act to "expend fiscal year appropriations so as to prevent the necessity for a supplemental or deficiency appropriation and to avoid exhausting the funds before the end of the period for which they are appropriated"); 36 Comp. Gen. 699 (1957) (concluding that a Post Office request for reapportionment of its funds was inconsistent with the spirit and purpose of the Antideficiency Act where officials believed that the requested handling of its funds would result in a deficiency at the end of the fiscal year); *see also* B–167656, 1971 WL 25416 (C.G. June 18, 1971) (unpublished); 38 Comp. Gen. 501 (1959).[7]

We understand that you made efforts to address the anticipated funding deficiency by developing a reprogramming arrangement with the Justice Management Division ("JMD"), but that the arrangement under consideration has not received approval. We encourage you to continue to pursue this option and to develop an alternative plan to satisfy the obligations outlined in this memorandum. Without making any specific recommendations about the measures that might be incorporated into such a plan, we note that, in addition to reducing prisoner detention-related expenditures in a manner that would not constitute a drastic curtailment of services within the meaning of the statute, the USMS is free to explore other

---

H.R. Rep No. 79–221, at 2–3 (1945), on the First Deficiency Appropriation Bill. The second report on the same subject, prepared only a year later, echoes these sentiments, but also reveals that Congress was also concerned about the specific problem of the failure of government officials to adjust rates of expenditures and obligations in anticipation of a possible deficiency. H.R Rep. No. 79–1817, at 4–5 (1946), on the Second Deficiency Appropriation Bill states.

> [I]nstances have occurred where agencies do not actually incur deficiencies but proceed at an obligational rate which make necessary either a deficiency appropriation or the suspension or drastic curtailment of an activity for lack of funds. The committee does not propose to tolerate that practice any longer It intends to see that the antideficiency law (31 U.S.C. 665) is observed m letter and spirit and shall expect the Bureau of the Budget to report quarterly, starting at the close of the first quarter of the next fiscal year, the title of any appropriation not being administered in accordance with the letter and spirit of such law, the reasons therefor, and the name and position of the official immediately responsible.

[6] We reach no conclusion in this opinion whether the USMS would qualify for any of the exemptions from the Antideficiency Act in the event it was found to have a deficiency. We will address that question in a forthcoming opinion.

[7] Though not binding upon this Office, *see Bowsher v. Synar*, 478 U S. 714, 727–32 (1986), the opinions of the Comptroller General and General Accounting Office provide helpful guidance on matters of appropriations law

possibilities for reprogramming funds within the Department of Justice's appropriation to avoid a possible deficiency. As we concluded in our 1980 opinion on the subject, the Attorney General, except where a specific statutory provision provides otherwise, has authority to reallocate funds among programs of the USMS and to make available to that agency funds presently allocated to other departmental programs and activities funded through the same lump sum appropriation. *Attorney General's Authority to Reprogram Funds for the United States Marshals Service to Avoid Deficiencies*, 4B Op. O.L.C. 701 (1980).

As I indicated above, we continue to research questions concerning the circumstances in which the USMS might be able to benefit from an exemption from the ADA in the event that an actual deficiency in its FPD appropriated budget occurs before the end of the fiscal year. You can expect a final opinion on these and other matters raised by your request in the near future.

> TODD DAVID PETERSON
> *Deputy Assistant Attorney General*
> *Office of Legal Counsel*