**UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS**

No. 05-3018

MISSOURI VETERANS COMMISSION, APPELLANT,

V.

JAMES B. PEAKE, M.D.,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued January 24, 2008          Decided May 15, 2008          )

*Andrea K. Spillars*, of Jefferson City, Missouri, for the appellant.

*Debra L. Bernal,* with whom *Paul J. Hutter,* General Counsel; *R. Randall Campbell*, Assistant General Counsel; and *Carolyn F. Washington*, Deputy Assistant General Counsel, were on the brief, all of Washington, D.C., for the appellee.

Before GREENE, *Chief Judge*, and KASOLD and DAVIS, *Judges*.

DAVIS, *Judge*: The appellant, Missouri Veterans Commission (Commission), appeals through counsel a June 24, 2005, Board of Veterans' Appeals (Board) decision that denied retroactive per diem payments prior to August 3, 2001, to the State of Missouri for operation of the Warrensburg Veterans Home (Home), a "State home facility" under 38 U.S.C. § 1741(d), in Warrensburg, Missouri. For the following reasons, the Court will reverse the June 2005 Board decision and remand the matter for the Board to order VA to distribute retroactive per diem payments for any care provided to eligible veterans at the Home on and after September 15, 2000.

## I. BACKGROUND

Between 1997 and 1998, the State of Missouri, through the Commission, applied for construction grants to build a nursing home facility for veterans in Warrensburg. Record (R.) at 16, 18. On April 10, 2000, the Commission's executive director formally requested a recognition survey

from VA and informed VA that, if the facility were approved, the Home would admit veterans beginning in July 2000. R. at 20. The Home was substantially completed in May 2000. R. at 22, 24. On September 15, 2000, VA initiated and completed the recognition survey of the Home. R. at 32-85. That same day, Michael W. Heaton, VA area project leader, issued a memorandum to the facility quality service director recommending that "the project be approved and accepted, as it appears that the State of Missouri has complied with the requirements for which the [construction] grant was authorized." R. at 87-88. On September 20, 2000, Dennis A. Hancher, a VA state home grant officer, recommended to the state home construction program chief that the project be approved.

In a September 25, 2000, letter to the survey team, the Home acknowledged that the fire doors located in the hallways of the facility needed vision panels with wired glass, and that corrective action was necessary to repair the gap between the fire doors and floors in accordance with National Fire Protection Association (NFPA) Life Safety Code (LSC) standards.[1] R. at 92. The assistant administrator of the Home indicated that the facility would meet the standards by installing vision panels in the doors on or before March 12, 2001. *Id.* On September 26, 2000, before correcting the defect involving the fire doors, the Home began admitting patients. R. at 96.

On October 19, 2000, Hugh Doran, the Kansas City VA Medical Center (VAMC) director, sent a letter to the VA Under Secretary for Health (Under Secretary), "making a tentative determination, based on the information available at this time, that the Warrensburg facility is in compliance with VA standards," even though the Home had not yet complied with two LSC standards. R. at 96. On January 18, 2001, the Commission's executive secretary and Acting Secretary of Veterans Affairs Hershel W. Gober executed a memorandum of agreement regarding the construction grant application. R. at 101-02. VA agreed to pay up to $13,624,051, but not more than 65% of the actual construction costs. *Id.* Acting Secretary Gober informed the Commission that it could "now submit claims for reimbursement of allowable expenses." R. at 104.

---

[1]The NFPA LSC standards are incorporated under 38 C.F.R. § 51.200 (2007) and are part of the "standards of subpart D" referred to in 38 C.F.R. §§ 51.10-51.50 (2007).

2

From March 21 to 23, 2001, VA conducted a followup survey. R. at 110-65. The LSC inspection noted that vision panels had not yet been installed. R. at 163. Again, Mr. Doran made a tentative determination that the Home complied with VA standards. R. at 167.

A July 31, 2001, memorandum confirms that the vision panels were installed on August 3, 2001. R. at 169. Other construction paperwork suggests that the vision panels were installed on June 11, 2001.[2] R. at 170.

On August 16, 2001, Under Secretary Thomas L. Garthwaite, M.D., recognized the Home as a state home for veterans for the purpose of receiving per diem payments from VA for the care of eligible veterans. R. at 178. The Under Secretary determined that "VA will provide aid retroactive to the date all VA standards were met." *Id*. This resulted in a retroactive per diem payment date of August 3, 2001, the date the Under Secretary determined that the Home complied with all VA standards.

The Commission filed a Notice of Disagreement with VA, arguing that the Home became eligible to receive per diem payments on September 15, 2000, the date VA completed its initial survey, which *ultimately* resulted in recognition. The Commission contended that the September 2000 VA inspection indicated that the Home complied with VA standards, and that, when notified of two minor deficiencies, it began the process of making upgrades. R. at 209. The Commission maintained that VA's decision denied the state $906,000 in per diem payments. *Id*. VA responded with a Statement of the Case. R. at 213-17. The Commission completed its Substantive Appeal to the Board. On March 22, 2004, the Commission presented its case to the Board of Veterans' Appeals sitting in St. Louis, Missouri. R. at 375-428. Now before this Court on appeal is the June 24, 2005, Board decision denying per diem payments to the Commission for care provided to veterans prior to August 3, 2001.

## II. CONTENTIONS ON APPEAL

The Commission asserts that the Board violated VA regulations by requiring that per diem payments be made from the date of the survey that led to the August 2001 determination that the

---

[2]The Court discerns no reason for the discrepancy in the dates mentioned in the memorandum, and the parties were unable to provide an explanation at oral argument.

Home met VA standards when it denied per diem payments for care provided earlier than August 3, 2001. Alternatively, the appellant contends that the Board erred when it found that equitable estoppel did not apply to the facts and circumstances of this case.

The Secretary states that the Home was not in compliance with VA standards until August 3, 2001, and that this is the proper date for commencement of per diem payments. The Secretary further maintains that the application of equitable estoppel against the Government is barred in this case.

## III. ANALYSIS

### A. Jurisdiction

The parties assert that the Court has jurisdiction over this matter, and the Court agrees. The Court has jurisdiction over final Board decisions and persons adversely affected by such decisions. *See* 38 U.S.C. §§ 7252 and 7266; *see also Ingram v. Nicholson*, 21 Vet.App. 232, 239 (2007). The Board issued its decision on June 24, 2005. The Commission is a "person" adversely affected by a final Board decision within the meaning of section 7266 and has filed a timely Notice of Appeal with this Court. *See St. Patrick Hosp. v. Principi*, 4 Vet.App. 55 (1993) (holding that hospital is "person adversely affected"). We therefore have jurisdiction and turn to the merits of the appeal.

### B. Date of Survey Forming Basis for Recognition

Section 1741 of title 38, U.S. Code, sets forth the criteria for per diem payments to state-run veterans homes. The implementing regulations clearly state that the Under Secretary need not recognize a veterans' home, *see* 38 C.F.R. § 51.30, but they also state that, when recognition is granted, per diem payments shall be paid retroactively to the date of completion of the VA inspection survey that provided the basis for determining that the facility met the standards set forth in the regulations, *see* 38 C.F.R. § 51.40(a)(4). The parties agree that payments are to be made retroactive to the date of completion of the survey forming the basis for the Under Secretary's approval; they dispute when that survey was completed. The Secretary contends the Board correctly found that the survey was completed on August 3, 2001, whereas the appellant contends it was completed September 15, 2000. Although the Secretary argues, further, that the Board correctly found that the pertinent survey was not completed in this instance until the Under Secretary received confirmation

4

in August 2001 that any deficiencies had been corrected and standards met, his argument is not supported by logic or law.

By VA regulation, a survey covers all parts of the facility and a review of all records bearing on compliance with VA requirements. *See* 38 C.F.R. § 51.30(c). VA may conduct such surveys at any time during the recognition application process. *See id.* VA conducted its original survey of the Home on September 15, 2000. R. at 32-83. Although the VAMC director noted that the fire doors located in the hallways of the Home needed wired glass vision panels and that the gaps between the doors and floors needed adjustment, he also made a tentative determination "that the Warrensburg facility [was] in compliance with VA standards." R. at 96. Furthermore, patients were admitted into the facility on September 26, 2000, and VA was so informed, shortly after the initial survey was completed. Also, VAMC Director Doran again noted compliance with the regulations in an October 19, 2000, letter to the Under Secretary, in which he requested "that the survey team conduct a six-month follow-up survey to determine that the facility *continues to be in compliance with all VA standards*." R. at 96 (emphasis added). Inasmuch as patients were not in the Home when the original survey was completed, the six-month followup survey in March 2001 appears to have been undertaken as a matter of routine practice. *See* 38 C.F.R. § 51.30(a)(2) (calling for annual certification after recognition to determine whether the home remains in compliance with VA standards). Moreover, the Secretary conceded in his brief and at oral argument that the September 15, 2000, survey was complete that same day. *See* Secretary's Brief at 9. In contrast, there is no evidence in the record establishing that a survey team visited the Home in August 2001.

Pursuant to VA regulation, and as the Commission asserted at oral argument, the VAMC director's recommendation is a significant intersection in the road to recognition of a state home. If the director had concluded that the facility was not in compliance, he would have been required to so notify the Home and the State and advise of the State's right to appeal his decision. 38 C.F.R. § 51.30(d). However, there is no evidence of such notice or advisement, and neither party argues that such notice was provided. Indeed, the only action in the entire certification process that the Under Secretary took was his August 16, 2001, recognition of the Home for the purpose of receiving per diem payments. R. at 178.

5

Furthermore, section 1742 and its implementing regulations instruct that "[n]o payment or grant may be made to any home under this subchapter unless such home is determined by the Secretary to meet such standards as the Secretary shall prescribe." 38 U.S.C. § 1742(a); *see also* 38 U.S.C. § 1741; 38 C.F.R. §§ 51.30, 51.40, 51.60, 59.130(d)(1) (2007) (requiring state homes to comply with the NFPA LSC as a condition of receiving a state home construction grant). Yet, on January 18, 2001, Acting Secretary Gober approved the Home's grant application and specifically authorized the Commission to start submitting claims for reimbursement for the construction costs it had incurred. *See* R. at 104. Given Acting Secretary Gober's action with regard to this grant, as well as the VAMC director's tentative certification of compliance with all VA standards and failure of the Under Secretary to reject that certification, it is clear that the Secretary does not require absolute compliance with all technical standards of the regulation for a survey to be complete or for a home to be certified; rather, in the context of these statutory and regulatory provisions, substantial compliance with Subpart D of 38 C.F.R. part 51 is sufficient to meet the reasonable objectives of the statute. This comports with the general legal concept that substantial compliance means actual compliance with the essential objectives of a statute or regulation, so as to carry out its intent. *See, e.g.*, *Marshall v. Warwick*, 155 F.3d 1027, 1031 (8th Cir. 1998); *Alioto v. Hoiles*, 488 F. Supp. 2d 1148, 1153 (D. Colo. 2007); *see also Dyment v. West*, 13 Vet.App. 141, 147 (1999) (holding that *Stegall v. West*, 11 Vet.App. 268 (1998), requires substantial, not absolute, compliance).

Here, the Under Secretary had every opportunity to deny recognition after receiving the VAMC director's tentative determination, but he did not do so. Rather, he withheld recognition until he was satisfied that the Home was in full compliance with all VA standards. Nevertheless, because payments are retroactive to the survey upon which the Under Secretary bases his decision, and not to the date of his decision, we need not decide whether the Under Secretary can deny certification until there is actual, as opposed to substantial, compliance. *See* 38 C.F.R. § 51.30(a)(1). Considering the record as a whole, and for the reasons stated above, we conclude that the Board's finding that the Under Secretary's decision was based on a survey completed on August 3, 2001, is not plausible and the Court has "'the definite and firm conviction that a mistake has been committed.'" *Gilbert v. Derwinski*, 1 Vet.App. 49, 52 (1990) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Rather, the facts and evidence support only one conclusion: that the

September 15, 2000, survey certifying compliance with VA standards – and after which veterans were admitted to the Home with VA's knowledge on September 26, 2000–was the survey that provided the basis for determining compliance and upon which recognition was ultimately granted.

## C. Equitable Estoppel

Although equitable estoppel is not permitted where an award is not authorized by law, it may be appropriate when an award is otherwise authorized and funds appropriated but the award and payment are not forthcoming as a result of improper agency action. *See Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414 (1990); *Elsevier v. Derwinski*, 1 Vet.App. 150 (1991); *Fugere v. Derwinski*, 1 Vet.App. 103 (1990); *see also Rosenberg v. Mansfield*, 22 Vet.App.1, 5-7 (2007) (Kasold, J., concurring). Nevertheless, because our reversal of the Board's decision means that the Warrensburg Veterans Home, in Warrensburg, Missouri, is entitled to retroactive per diem payments from September 15, 2000, the Court need not address appellant's argument that equitable estoppel is appropriate in this case.

## IV. CONCLUSION

The Court having considered the parties' briefs and arguments presented during oral argument, and having reviewed the record on appeal, the Board's June 24, 2005, decision is REVERSED and the matter REMANDED for action consistent with this opinion.